UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | | |
|---|---|---|
| ELITE PHYSICIAN SERVICES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:06-CV-86 |
| | ) | |
| v. | ) | *Mattice/Carter* |
| | ) | |
| CITICORP CREDIT SERVICES, INC. (USA), | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO DISMISS OR TRANSFER**

# Defendant's Exhibit A

# (CPSI State Court Complaint)

IN THE CIRCUIT COURT OF HAMILTON COUNTY, TENNESSEE



| | |
|---|---|
| ELITE PHYSICIAN SERVICES, LLC, ) | |
| ) | |
| Plaintiff, ) | Docket No. 05C1651 |
| ) | |
| vs. ) | |
| ) | Jury Trial Demanded |
| CITICORP PAYMENT SERVICES, INC., ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT

The Plaintiff, Elite Physician Services, LLC ("Elite"), by and through counsel, complains against the Defendant Citicorp Payment Services, Inc. ("Citicorp") as follows:

### PARTIES

1. Elite is a Tennessee limited liability corporation with its principal place of business in Chattanooga, Tennessee.

2. Citicorp is a Delaware corporation with its principal place of business, based on information and belief, in Deerfield, Illinois.

### JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to T.C.A. §§ 16-11-102 and 47-18-109(a)(2). Venue is properly laid in this judicial district under T.C.A. §§ 47-18-109(a)(2) and 47-18-113.

### FACTUAL BACKGROUND

4. This case involves a course of intentionally deceptive and unfair commercial conduct by Citicorp in connection with its provision of services to Elite. After contracting with Elite, Citicorp engaged in a series of deceptive acts for the undisclosed purpose of taking Elite's business enterprise for its own benefit without just compensation.

2531376_1.DOC                                   1

5.  Prior to and during 2003, Elite built a successful business in the health-care-services patient financing industry. As a health-care-services patient financing company, Elite offered credit services which enabled consumers to finance certain health-care procedures that were not covered by insurance. For example, Elite's programs allowed consumers to finance certain hearing-related and cosmetic surgery procedures as well as other health-care procedures. In developing this business, Elite forged numerous valuable relationships with health-care organizations and health-care providers who benefited from the financing program and promoted it to their patients. By 2003, Elite had built its enterprise to the point where it had over $20 million in annual sales.

6.  In 2002, Elite was approached by Citicorp and asked to enter into a long-term, exclusive relationship in which Elite would continue to develop sales in the patient financing industry in conjunction with Citicorp. Specifically, Citicorp proposed that Citicorp and Elite cooperate to develop and to promote a health-care patient financing program known as the Citi Health Card. As proposed by Citicorp, the Citi Health Card program would combine the globally recognized "Citi" name and Citicorp's mammoth financing resources with Elite's experience in new account acquisition and support to allow them to dominate the health-care patient financing industry.

7.  However, on information and belief, contrary to these representations Citicorp did not intend for the relationship to be either exclusive or long-term. Elite asserts that Citicorp used Elite to introduce the Citi Health Card into the patient financing industry and to gain the benefit of Elite's industry presence and expertise in health-care patient financing sales and support. Citicorp knew that after doing so it could terminate its relationship with Elite and take, without paying for it, the business it had taken Elite years to build.

8. In ensuing discussions, Citicorp's agents repeatedly represented it was capable of providing and would provide the highest quality advertising, marketing, and transaction-processing services available in the industry to execute the proposed plan. Citicorp representatives described in detail how Citicorp's vast resources and newly developed telephone information processing capabilities would enable Citicorp and Elite to overwhelm the competition in the developing health-care-services patient financing industry. Citicorp represented that through combining Elite's business model and contacts with Citicorp's "world class" capabilities, the companies would increase sales to over $1.4 billion within five years. Elite fully and justifiably relied on these representations. For example, based on its reliance on Citicorp's representations, Elite bypassed other business opportunities which would have allowed Elite to expand its business through relationships with other parties. The health-care patient financing services market was a nascent and growing market when Elite and Citicorp began their relationship, and the market has continued to grow dramatically.

9. Relying on Citicorp's representations of its ability to deliver the services necessary for the proposed venture to succeed, Elite and Citicorp entered into a Master Services Agreement (the "Agreement") under which Elite and Citicorp agreed to cooperate in developing the Citi Health Card program and to promote it to health-care providers and consumers. The program was designed to enable a large volume of consumers to easily and quickly finance various health-care procedures not typically covered by insurance, including but not limited to dental, orthodontic, vision, and hearing-related procedures. Under the Agreement, both Elite and Citicorp agreed to assume certain rights and obligations. In particular, Citicorp agreed to provide Elite with the services necessary to implement the Citi Health Card program.

10. Elite at all times performed its obligations under the Agreement in good faith.

11. Despite Elite's performance of its obligations under the Agreement, agents of Citicorp began to engage in an intentionally deceptive course of conduct calculated to frustrate the purpose of the Agreement. In so doing, Citicorp thwarted Elite's performance while taking the opportunity to use Elite's business model to introduce the Citi Health Card and to learn the industry.

12. After entering into the Agreement, Citicorp falsely represented and promised Elite that it would provide particular high-quality advertising, marketing, and transaction-processing services to Elite. Despite these promises and representations, Citicorp intentionally and deceptively provided services of a substantially inferior quality or no services at all. In particular, Citicorp falsely promised to implement a world-class automated telephone processing system to facilitate customer applications for financing services. Elite justifiably relied on these promises. Instead, Citicorp implemented an inadequately tested, unreliable, unstable, and difficult-to-use telephone processing system. The failure of the automated telephone processing system caused many calls to be transferred to customer service representatives of Citicorp who were either unaware of the Citi Health Card program or were inadequately trained to provide a reasonable level of service. Despite the system's failure, Citicorp falsely represented that it was working properly and failed to take the steps necessary to correct the problems it had created.

13. After entering into the Agreement, Citicorp continued to falsely represent and to promise to Elite that it would provide particular high-quality advertising, marketing, and transaction-processing materials and technologies to Elite. Elite justifiably relied on these representations and promises. Despite these representations and promises, Citicorp intentionally and deceptively provided materials and technologies of a substantially inferior quality or none at all. For example, Citicorp provided a brochure for distribution to patients/consumers by health-

2531376_1.DOC                              4

care providers, but failed to include on the brochure the toll-free telephone number for credit applications even though telephone applications made directly by consumers was a planned method for sales.

14. Elite asserts that Citicorp was capable of providing the high-quality services, materials, and technologies which Citicorp represented it would provide and which were essential to the success of the joint venture, yet Citicorp deceitfully failed to do so.

15. Elite repeatedly requested Citicorp to provide services, materials, and technologies which conformed to Citicorp's representations, promises, and obligations. Citicorp acknowledged many deficiencies in its performance; yet instead of timely correcting identified deficiencies, Citicorp redirected Elite to focus its efforts on "new initiatives" and falsely promised that it would provide other services which would carry out the purposes of the Agreement. Elite relied on these representations. Notwithstanding its representations, Citicorp never adequately corrected the deficiencies in its performance or provided other promised services.

16. On information and belief, Citicorp was willing to accept short-term losses associated with processing deficiencies in the Citi Health Card program because such losses would not hinder Citicorp's pursuit of its overall undisclosed scheme: to use Elite as a disposable tool to facilitate Citicorp's progress in other ventures in the health-care patient financing industry.

17. By thus intentionally and deceptively frustrating the purpose of the Agreement while Elite continued to perform, Citicorp not only caused catastrophic financial injury to Elite but also caused Elite's reputation within the health-care-services patient financing industry to be irreparably damaged.

18. Citicorp maintained its deception of Elite long enough to enable Citicorp to take unfair advantage of Elite's good faith performance. On or about May 10, 2005, Citicorp abruptly informed Elite that it was terminating its relationship with Elite. It was only upon this termination of the relationship that Elite became aware of Citicorp's deceptive strategy to take Elite's business without just compensation.

19. The mechanism by which Citicorp terminated its relationship with Elite was a provision in the Agreement which purportedly allowed Citicorp to terminate the Agreement "at any time and for any reason not otherwise included" in the Agreement. However, both before and after execution of the Agreement, Citicorp falsely represented to and agreed with Elite that this open-ended termination provision was to be used only in the event that Citicorp chose to discontinue its participation in the health-care patient financing industry. As part of its deceptive scheme, Citicorp has invoked this termination provision even though it has not discontinued its participation in this industry.

20. Since terminating its relationship with Elite, Citicorp has continued to market the Citi Health Card. In so doing, Citicorp has unfairly and without just compensation taken control, for its own benefit, over the clients and business enterprise which Elite had developed.

### VIOLATION OF TENNESSEE CONSUMER PROTECTION ACT

21. Elite repeats the allegations contained in Paragraphs 1 through 20 above.

22. Citicorp has engaged in unfair and deceptive acts and practices in violation of the Tennessee Consumer Protection Act, including but not limited to violations of T.C.A. §§ 47-18-102 and 47-18-104(b)(27). Furthermore, Citicorp has represented to Elite that goods or services have characteristics, uses, or benefits which they did not have in violation of T.C.A. § 47-18-

104(b)(5) and has represented that goods or services are of a particular standard, quality, or grade when they were of another in violation of T.C.A. § 47-18-104(b)(7).

23. Elite is a Tennessee consumer which has suffered ascertainable losses as a proximate result of Citicorp's deceptive acts and practices, including, but not limited to, the value of Elite's business which Citicorp has unlawfully taken through its deceptive acts and subterfuge. See T.C.A. § 47-18-109(a)(1). Elite is therefore entitled to recover actual damages from Citicorp as compensation for those losses as well as treble damages and Elite's reasonable attorneys' fees and costs. See T.C.A. §§ 47-18-109(a)(1), 47-18-109(a)(3)-(4), and 47-18-109(e)(1).

WHEREFORE, Elite respectfully requests that this Court enter a judgment against Citicorp awarding Elite: (1) compensatory damages in an amount to be proved at trial; (2) treble damages pursuant to T.C.A. § 47-18-109; (3) its reasonable attorneys' fees and costs pursuant to T.C.A. § 47-18-109; (4) prejudgment and post-judgment interest; and (5) such other and further relief as the Court deems necessary and proper, see T.C.A. § 47-18-109(a)(3).

Respectfully submitted,

MILLER & MARTIN PLLC

By: *[signature]*
Donald J. Aho (BPR No. 011975)
Robert F. Parsley (BPR No. 023819)
1000 Volunteer Building
832 Georgia Avenue
Chattanooga, Tennessee 37402
(423) 756-6600 – Telephone
(423) 785-8480 – Facsimile

*Counsel for Elite Physician Services, LLC*

2531376_1.DOC                                7