## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF TENNESSEE
#### at CHATTANOOGA

ELITE PHYSICIAN SERVICES, LLC,    )
                                  )
              Plaintiff,          )
                                  )          No. 1:05-CV-344
vs.                               )
                                  )
                                  )          Chief Judge Collier/
CITICORP PAYMENT SERVICES, INC.,  )          Magistrate Judge Carter
                                  )
              Defendant.          )

## DECLARATION OF DR. KEITH B. DRESSLER

I, Dr. Keith B. Dressler, hereby declare and state as follows:

1.      I am a resident of Hamilton County, Tennessee, and one of the two principals of Elite Physician Services, LLC ("Elite"). I am employed as an orthodontist in Chattanooga, Tennessee. I have personal knowledge of the matters set forth herein. This declaration is provided in support of Elite's response to the Motion to Transfer filed by Citicorp Payment Services, Inc. ("CPSI").

2.      Prior to entering into a business relationship with CPSI, Elite was a successful health-care-services patient financing company located in Chattanooga, Tennessee. Elite offered credit services to health-care providers which enabled consumers to finance certain health-care procedures that were not covered by insurance. Elite was and is owned by Mr. Michael D. Salisbury and me. Mr. Salisbury served as the company's Chief Executive Officer. In 2003, Elite had built its business to the point where it had over $20 million in annual sales.



EXHIBIT
H

3.      In 2002, I was approached in Chattanooga by representatives of Citi Commerce Solutions ("CCS"), which I understood to be a Citigroup, Inc. affiliate whose representatives were headquartered in Deerfield, Illinois.  CCS requested Elite to enter into a long-term, exclusive relationship in which Elite would continue to sell and distribute products and services in the patient financing industry in conjunction with CCS and its affiliate, CPSI.  At the beginning of my discussions with CCS, I had primary contact with Mr. Darin Boddicker of CCS and Mr. Ken Olsen of Citi Cards.  In late 2002 and early 2003, Mr. Boddicker, as a representative of CCS and CPSI, was heavily involved in the negotiation of the terms of the agreement into which Elite and CPSI ultimately entered.  However, he was aided in this process by Mr. Patrick Shanders, another CCS and CPSI representative.  Mr. Boddicker and Mr. Shanders were located at CCS's/CPSI's offices in Deerfield, Illinois, and at all times relevant acted as agents of CCS/CPSI.  It was not until April 2003 that I became aware that Elite's agreement would be with CPSI and not CCS.

4.      All of the meetings that took place between Elite and the CCS and CPSI representatives leading up to the execution of the agreement between them took place either in Chattanooga, Tennessee, in Gray, Tennessee or in Deerfield, Illinois.  Subsequently, Mr. Shanders, Mr. Boddicker and other CCS/CPSI representatives came to Chattanooga on several occasions to meet with Elite representatives.  At no time were meetings ever held in New York.

5.      Elite learned during its discussions with Mr. Boddicker and Mr. Shanders that the marketing support it would receive would be handled by Ms. Lori Cavicchioni, an agent of CCS and CPSI, who was and is also located in Deerfield, Illinois.  Elite also learned that customer service support would be provided to Elite by persons located at CCS's office located at 541 Sid

Martin Road in Gray, Tennessee.[1]  The person primarily responsible for this aspect of the relationship with Elite was Ms. Debra Sexton who is located in Gray, Tennessee.  The CCS facility in Gray, Tennessee is very large and currently employs more than 1,700 people.  The CCS/CPSI representatives took me and other Elite representatives to the Gray facility as a part of their effort to induce Elite to enter into an agreement with CPSI.  A description of the Gray, Tennessee operation is posted on Citigroup's website.  A true and correct copy of the description is attached hereto as Exhibit 1.

6.    As a result of the negotiations with the CCS/CPSI representatives from Deerfield, Illinois, the parties entered into a Master Services Agreement (the "Agreement") dated April 9, 2003.  The Agreement outlines the services that Elite and CPSI were to provide to one another and to participating providers in the Citi Health Card Program.  One aspect of the business relationship with CPSI for which Elite was responsible was to solicit health-care providers to enter into a provider agreement with Citi Bank USA, N.A. which was a South Dakota banking corporation with its principal place of business located in Sioux Falls, South Dakota.  A form Provider Agreement was attached to the Agreement as Exhibit 1.01(a).  See Exhibit 2.  It is notable that the provider agreements were governed and construed under South Dakota law and that any notices under the Agreement were to go to Citibank USA, N.A. in South Dakota with a copy to Citi Commerce Solutions, Inc. in Deerfield, Illinois.  The provider agreement is further evidence of the lack of any material connection between this action or the parties' business relationship with New York.

---

[1] Gray, Tennessee is located in Washington County, Tennessee, approximately mid way between Kingsport and Johnson City.  Gray falls within the Eastern District of Tennessee.

7.      Elite disputes that the Agreement contains a valid and enforceable clause requiring litigation to take place in New York because Elite was fraudulently induced to enter into the Agreement by CCS's/CPSI's false representations and promises.

8.      Although the Agreement was apparently signed on behalf of CPSI by Ms. Julie Pukas as President of CPSI, I never met with or spoke to Ms. Pukas and do not know who she is. Similarly, I am unaware of any contact between any other Elite representative and Ms. Pukas.

9.      CPSI is a Delaware corporation.  I always understood the company's principal place of business to be located in Deerfield, Illinois, as most of the persons who served as representatives for the company (who were also agents of CCS) were located in Deerfield. However, as discussed below, several representatives of the company were also located in Gray, Tennessee.

10.     After the execution of the Agreement, virtually all business communications between Elite and CPSI occurred between CCS's/CPSI's Deerfield, Illinois agents, Elite's personnel in Chattanooga and CCS's/CPSI's representatives in Gray, Tennessee.

11.     All of Elite's business records are located in Chattanooga, Tennessee.  The records are voluminous as they compromise the records of Elite's business operations since it began in 1999.

12.     Since all of CPSI's agents were and are located in Deerfield, Illinois or Gray, Tennessee, I fully expect that CPSI's relevant business records are located in those cities rather than in New York.  I note that Mr. Shanders, in his affidavit, does not indicate that any records are located in New York.

13.     The following summary not only identifies key witnesses relating to this dispute who Elite expects to provide important testimony but also provides a detailed description of the testimony they are expected to provide.  Many of the witnesses are former Elite employees. They are, however, no longer employed by Elite because their employment had to be terminated after CPSI terminated the Agreement.  As a result of the termination, Elite had to lay off its entire workforce of twenty-one employees, many of whom are still unemployed.  As such, with the exception of Mr. Salisbury and myself, Elite cannot exercise the control over these witnesses that employers typically can.  Moreover, traveling to New York to testify would impose financial hardship on the following witnesses, especially for those who remain unemployed, which could present an obstacle to obtaining their live testimony.

A.     **Dr. Keith B. Dressler.**  I have knowledge of and will testify concerning all aspects of the negotiations leading up to the Agreement, the business relationship between Elite and CPSI, and the issues raised by way of Elite's claim against CPSI.  I reside in Signal Mountain, Tennessee, very near Chattanooga.

B.     **Mr. Steve Tees.**  Mr. Tees was the President of Elite.  As such, he has knowledge of business relationships between Elite, CPSI and CCS following the execution of the Agreement.  Mr. Tees is expected to give testimony on all matters relating to the issues raised by way of the Amended Complaint.  Mr. Tees lives in Signal Mountain, Tennessee.

C.     **Mr. Michael D. Salisbury.**  Mr. Salisbury was the Chief Executive Officer and a principal of Elite.  He has knowledge of all aspects of the relationship between Elite and CPSI both before and after the execution of the Agreement.  He has particularized knowledge of Elite's sales and marketing efforts.  He will testify on all matters relating to Elite's

claim against CPSI. Mr. Salisbury lives in Chattanooga, Tennessee. Because he is a principal of Elite, Elite does not consider him a non-party witness.

      D.    **Mr. Wayne T. Clay.** Mr. Clay served as Elite's Chief Operating Officer. As such, he was in charge of data processing and financial matters for Elite. He also served as Elite's liaison with CCS's personnel in Gray, Tennessee. As such, Mr. Clay is expected to testify concerning the issues relating to the nature of the relationship with CCS's personnel in Gray, Tennessee and problems relating to that relationship. Mr. Clay has knowledge of Elite's financial matters and is expected to give testimony relating to those matters. He will also be able to testify about the manner in which Elite was terminated and the conduct of the CPSI representatives who implemented the termination. Mr. Clay is currently unemployed and lives in Chattanooga, Tennessee.

      E.    **Ms. Sheri Groves.** Ms. Groves was employed as a sales representative with Elite. She was hired after the creation of Elite's relationship with CPSI to handle Elite's business relationship with Channel 3 Endorsement ("Channel 3"). Channel 3 is comprised of premiere dentists and consultants who provide continuing education and consulting advice to practicing dentists. The organization is highly influential in the dental profession and was a valuable source of referrals for Elite. Ms. Groves will provide testimony concerning the value of Elite's relationship with Channel 3 and how that relationship was damaged due to CPSI's failure to provide the services it promised to provide. Ms. Groves is a resident of Chattanooga, Tennessee and is currently unemployed.

      F.    **Ms. Darda Kerfeld.** Ms. Kerfeld was head of sales for Elite and responsible for managing all of Elite's sales efforts. Ms. Kerfeld routinely dealt with CPSI

representatives, such as Mr. Darin Boddicker, Mr. Patrick Shanders, and Ms. Lori Cavicchioni.
Ms. Kerfeld will provide testimony concerning issues relating to CPSI's failures to provide the
marketing resources and services which CPSI promised to provide in connection with the
marketing of the Citi Health Card. She will testify concerning the problems that Elite's other
sales representatives experienced in dealing with CPSI concerning its failure to provide the
services it was obligated to provide. Ms. Kerfeld will also be able to testify concerning the
problems Elite experienced due to failure of the CPSI representatives located in Gray, Tennessee
to properly support the program. Ms. Kerfeld is a resident of Lookout Mountain, Tennessee,
very near Chattanooga, and is currently unemployed.

      G.    **Mr. Gary Moore.** Mr. Moore served as a sales representative for Elite.
One of his responsibilities was to communicate with CPSI representatives and assist in training
concerning the initial test for implementing nationwide distribution of the Citi Health Card
through various CPSI affiliates. He will testify concerning the fact that the work he was
performing on this project should have been performed by CPSI representatives as part of the
services to be provided under the agreement, but that CPSI failed to do so. Mr. Moore will also
be able to provide testimony concerning specific problems that Elite experienced due to CPSI's
shortcomings and failure to provide the services it was required to provide. Mr. Moore is a
resident of Chattanooga, Tennessee.

      H.    **Ms. Joyce McCullough.** Ms. McCullough was employed as the Vice-
President of Elite and head of Elite's corporate accounts division. She was Elite's very first
employee. Ms. McCullough will testify concerning how the problems Elite experienced due to
CPSI's inability or refusal to provide the promised services to Elite caused Elite to lose major

accounts and impeded its ability to gain accounts. Ms. McCullough will testify concerning the deficiencies in CPSI's marketing efforts and how Elite was required to "work around" the failures of CPSI's marketing efforts in order to advance the Citi Health Card Program. Ms. McCullough is a resident of Chattanooga, Tennessee.

I.    **Ms. Gina Glass.** Ms. Glass was the Vice-President of Promotion and Marketing with Elite. Ms. Glass will provide testimony concerning her dealings with CPSI representatives, including Ms. Lori Cavicchioni and other marketing representatives, concerning quality control and related problems which Elite experienced with the services provided by CPSI. Ms. Glass has detailed knowledge concerning Elite's relationships with virtually all of its clients and the unique problems that CPSI's failures presented to each one of them. Ms. Glass resides in Signal Mountain, Tennessee.

J.    **Ms. Dawn Simpson.** Ms. Simpson was employed by Elite as a support representative for the Citi Health Card Program. She will provide testimony relating to the numerous and ongoing problems which Elite experienced with the CPSI Phone Terminal described in Elite's Amended Complaint. She will also testify concerning Elite's dealings with CPSI representatives located at the CCS call center in Gray, Tennessee. Ms. Simpson will testify about technical problems with the Phone Terminal, problems with CPSI's manuals, support problems with the Phone Terminal and health-care provider complaints relating to these problems. For example, she will provide testimony concerning the need to redraft CPSI's manual in order to include important procedures such as the "forced draft capture." Ms. Simpson resides in Chattanooga, Tennessee and currently has only temporary employment.

K.    **Ms. Kate Watson.**  Ms. Watson was employed by Elite to provide support to health-care providers using the Citi Health Card Program.  As part of her duties, Ms. Watson provided training to health-care providers concerning the use of the Phone Terminal.  She will be able to provide testimony concerning how the problems with the CPSI Phone Terminal experienced by providers resulted in provider refusal to use the Phone Terminal and numerous account closures.  Ms. Watson resides in Chattanooga, Tennessee.

14.    Although I have already provided information relating to the CCS/CPSI agents referenced above, the following further specifies the testimony that they are expected to give in this matter.

A.    **Ms. Debra Sexton.**  Ms. Sexton serves as the "Manager-Client Development" for CCS at the call center in Gray, Tennessee.  Ms. Sexton is expected to testify concerning the services provided by CCS in connection with Elite's business relationship with CPSI.  She is also expected to testify about the numerous communications Elite representatives had with CCS relating to problems with the Phone Terminal, client's service issues, performance reports provided by Citi to Elite, and related matters.

B.    **Mr. Ken Harris.**  Mr. Harris served as "Manager [of] Quality Services" for CCS in Gray, Tennessee.  Mr. Harris is expected to provide testimony concerning the high quality of the services provided by Elite and the poor quality of the services provided by CPSI.  Mr. Harris should be able to testify about the problems experienced by CPSI with delivery of the services it was obligated to provide to Elite and health-care providers and will be able to document those problems.  Mr. Harris visited Elite on February 9, 2005 for the stated purpose of

closely inspecting Elite's operations, thereby learning important information about Elite's operations.

           C.       **Ms. Theresa Breedlove.**  Ms. Breedlove was employed by CCS in Gray, Tennessee.  She was another representative with whom Elite had frequent contact.  Ms. Breedlove is expected to testify concerning contacts she had with Elite representatives about the numerous problems Elite experienced with the services provided by CPSI.

           D.       **Ms. Cindy Dobbs.**  Ms. Dobbs was employed by CCS as a Customer Service Trainer in Gray, Tennessee.  Ms. Dobbs will testify concerning her visit to Elite's offices in Chattanooga, Tennessee on February 9, 2005 and Elite's efforts to perform high-quality work as part of its relationship with CPSI.  Ms. Dobbs will be able to testify concerning the problems experienced by Elite with the services provided by CPSI.  Ms. Dobbs should also be able to provide testimony concerning CPSI's plan to terminate its relationship with Elite and to duplicate Elite's operations in Gray, Tennessee.

           E.       **Mr. Craig Vallorano.**  Mr. Vallorano is believed to be President of CCS and an agent of CPSI who is located in Deerfield, Illinois.  He had overall responsibility for the relationship between CPSI and Elite.  Mr. Vallorano has in-depth knowledge of and should be able testify concerning all issues presented in Elite's Amended Complaint, including, but not limited to, all of the wrongful acts committed by CPSI in connection with its relationship with Elite.

           F.       **Mr. Darin Boddicker.**  Mr. Boddicker served as the Vice-President of CCS, an agent of CPSI, and was the leader of the Citi Health Card Program.  Mr. Boddicker has

in-depth knowledge of the issues presented in Elite's Amended Complaint. He will testify concerning the negotiation of the agreement with Elite, meetings with Elite personnel in Chattanooga, Tennessee, in Gray, Tennessee, and in Deerfield, Illinois, communications with Elite concerning the problems it experienced in its dealings with CPSI, CPSI's plan to unlawfully terminate its relationship with Elite, threats he made to Elite personnel, and other matters. Mr. Boddicker is located in Deerfield, Illinois.

G.    **Mr. Patrick Shanders.** Mr. Shanders is an agent of CPSI and believed to be employed by Citicorp Credit Services, Inc. (USA) as a Vice-President for Client Development and to have served as an agent for CCS and CPSI at all times relevant. Mr. Shanders will be able to provide testimony concerning his involvement with the handling of problems with the services provided by CPSI to Elite. Mr. Shanders will be able to testify concerning numerous meetings with Elite personnel held in Chattanooga, Tennessee relating to administration of the agreement between Elite and CPSI and the termination of the Agreement. Mr. Shanders is located in Deerfield, Illinois.

H.    **Ms. Lori Cavicchioni.** Ms. Cavicchioni is an agent of CPSI and is employed as "Vice-President – Associate Program Manager" at CCS. Ms. Cavicchioni was the employee of CCS responsible for the marketing of the Citi Health Card Program. She has in-depth knowledge of and should be able to testify about the issues relating to the marketing of the program and the problems Elite experienced due to CPSI's failure to provide the services it promised it would. Ms. Cavicchioni should be able to provide testimony concerning the meetings she had with Elite personnel on at least four different occasions in Chattanooga,

Tennessee concerning the marketing of the Citi Health Card Program and problems Elite was experiencing. Ms. Cavicchioni is located in Deerfield, Illinois.

I.      **Mr. Richard Ellis**.  Mr. Ellis was formerly employed by CCS as an auditor and was responsible for auditing Elite's books and records.  Mr. Ellis visited Elite's offices in Chattanooga, Tennessee in 2003 and on an almost quarterly basis in 2004 and 2005.  Mr. Ellis met with Elite representatives in Chattanooga for two to three days each quarter in order to perform his duties.  Mr. Ellis can provide testimony concerning the numerous problems Elite experienced with CPSI which he witnessed in Chattanooga.  Mr. Ellis has in-depth knowledge of and can testify concerning the financial information relating to the Citi Health Card Program and Elite's performance of its duties in connection with the Citi Health Card Program.  He is now employed by Merrill, Lynch, Pierce, Fenner and Smith in Chicago, Illinois.

15.      **Mr. Todd Schmiedeler**.  Mr. Todd Schmiedeler is a non-party witness expected to give important testimony in this matter.  Mr. Schmiedeler was a commissioned sales representative for Elite and resides in Louisville, Kentucky.  Mr. Schmiedeler was engaged by Elite at the insistence of Mr. Darin Boddicker and Mr. Pat Shanders, who represented that Mr. Craig Vallorano had so directed them.  Mr. Schmiedeler will testify concerning the numerous problems he experienced marketing the Citi Health Card Program due to CPSI's failure to provide the marketing and supporting services that it promised it would provide to Elite and health-care providers.

16.      The foregoing shows that none of the key witnesses identified above reside in or near New York.  Rather, they are located in either Illinois, Tennessee or Kentucky.

2753325_1.DOC

17.    It would be extremely inconvenient for Elite and cause it undue hardship if it were required to litigate this matter in New York. Because Elite is no longer a functioning business unit, it does not generate any income that could be used to pay the costs, expenses and attorneys' fees associated with this matter. Elite has closed its offices. Its only remaining asset of any significance is the value of its legal claims. Elite will have to rely on my financial resources and those of Mr. Salisbury in order to litigate its claim against CPSI. Funding this litigation presents a serious financial hardship for both of us, even if this case is heard in Chattanooga. However, this hardship will be exacerbated if the case is heard in New York because of all of the additional expense we will have to bear for travel, lodging, meals and court-reporting services relating to the preservation of witness testimony that is otherwise available in this district. Further, having to travel to New York in connection with this case would disrupt my ongoing orthodontic practice.

18.    On the other hand, CPSI had net sales of $49,958,788 through September, 2005 relating to the Citi Health Card Program. See Exhibit 3, Citi Health Card Financial Statements, dated September, 2005, p. 2. Obviously, CPSI's Citi Health Card Program is, unlike Elite, a highly viable financial enterprise. CPSI's relative financial means are incomparably better than those of Elite. As such, it is much better able to bear the cost of this litigation than Elite.

19.    Litigating this action in Chattanooga will be more convenient and less expensive for both parties. The witnesses affiliated with CPSI identified above who live in the Chicago area will be able to obtain direct flights from Chicago to Chattanooga if they wish to appear at trial here. The airline schedule attached as Exhibit 4 shows daily direct flights to Chicago from Chattanooga on American Airlines. There are no direct flights from Chattanooga to New York.

Further, hotel accommodations are much less expensive in Chattanooga than in New York. Indeed, as the news article attached as Exhibit 5 shows, hotel prices in New York are at an all-time high. (For purposes of comparison, Exhibit 7 contains a price schedule provided by a representative Chattanooga hotel located near the federal court.) The foregoing means both parties would be required to spend a great deal more money in connection with any court appearances or trial held in New York than in Chattanooga. Thus, the lower expense associated with proceeding with this action in Chattanooga inures to CPSI's and Elite's mutual benefit.

20.    Permitting this action to proceed in Tennessee will allow Elite to have the benefit of live witness testimony at trial of all the witnesses who were formerly employed by Elite and are identified as living in or near Chattanooga. Permitting the action to proceed here will also allow Elite to subpoena the witnesses affiliated with CPSI/CCS in Gray, Tennessee. These witnesses are expected to provide the important testimony described above. As such, it is important that Elite be able to compel their attendance at trial. If the case is tried in New York, all of the witnesses identified above for both parties would have to travel to New York in order to obtain their live testimony. This would maximize the inconvenience for all witnesses.

21.    The interest of justice will also be served by allowing this matter to go forward in this Court. This case is based on the acts of CCS/CPSI which took place primarily in Tennessee and which had devastating effects in Tennessee. Although CPSI seeks to move this action to New York, at no time did any of CPSI's representatives and agents object to coming to Tennessee to meet with Elite or to conduct business with the company. Under the circumstances of this case, where neither the claims asserted nor the parties' witnesses have any connection to New York, there is no reason to conduct the litigation there.

22.    Additionally, it cannot be disputed that CPSI did not terminate Elite for poor performance or for any breach of its agreement with CPSI. CPSI stated in its termination letter dated May 9, 2005 that "we have valued our relationship with Elite and wish you all the best in your future endeavors." Exhibit 6. Nevertheless, CPSI terminated Elite for "no reason" under a provision of the Agreement that its representatives and agents falsely represented would only be invoked if CPSI left the patient-finance business. Thus, inasmuch as Elite's claims are based on the false and deceptive conduct of CCS/CPSI, CPSI should not be allowed to unjustifiably increase the cost, expense and inconvenience associated with the litigation by having it conducted in a forum that has no significant relationship with the parties, the witnesses or the dispute.

23.    Last, the interest of justice will be served by allowing Elite and CPSI to litigate here, a forum which is more convenient not only for Elite's witnesses but also for the CCS witnesses located within this judicial district a two- to three-hour drive away in Gray, Tennessee, identified above. A trial here will allow Elite and CPSI convenient access to live witnesses at trial in a forum that will be far less expensive for both parties than litigating the case in New York.

24.    The copies of the documents attached hereto are true and correct copies.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this _____ 17th _____ day of February, 2006.

DR. KEITH B. DRESSLER
Member, Elite Physician Services, LLC

County of Hamilton

State of Tennessee

Notary Public

My commission expires 8-24-08 _____

Sworn to and subscribed before me this 17th day of February, 2006

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading was filed electronically on February 17, 2006. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

<u>s/Donald J. Aho</u>
(BPR No. 011975)
Miller & Martin PLLC
1000 Volunteer Building
832 Georgia Avenue
Chattanooga, Tennessee 37402
(423) 756-6600 – Telephone
(423) 785-8480 – Facsimile

2753325_1.DOC



· privacy · citi.com

· careers · use credit wisely · site map · citicards.com

| Careers Home | Job Search | Careers at Cards | About Cards | Life at Cards | Join Our Team | Locations | Site |

# Careers at Citi Cards

Job Search ▶



Citigroup On Campus
· Graduates & Undergraduates
...take the first step toward a career with endless possibilities.
click here

## Gray, Tennessee

    

Our Tennessee site hosts a state-of-the-art facility and currently employs more than 1,700 people. Our success comes from the relationships we build one by one. It's all about dedicated individuals accomplishing special things together. Here, we share the responsibility for creating an environment that enables each of us to better serve our customers. We invite you to learn firsthand what makes opportunities with Citibank in Gray so exciting and rewarding.

### About Gray - Where You Would Live and Work

Gray is a tranquil city surrounded by the Appalachian Mountains in beautiful Northeast Tennessee. It is conveniently located in the center of Johnson City, Kingsport and Bristol. The center is convenient to a major interstate, railway service, Tri-Cities Regional Airport and Foreign Trade Zone.

A moderate climate - featuring warm summers and mild winters - allows for year-round outdoor activities, including golfing, hunting, fishing, boating, hiking, backpacking, white water rafting and snow skiing. NASCAR enthusiasts can enjoy "the world's fastest half-mile track" at Bristol Motor Speedway.

The local area is filled with exceptional shopping to include large retail centers, local antiques and novelty stores. Several community colleges and universities are located within minutes of the facility and bring a wealth of learning opportunities to the area.

### Are you ready for a career with endless possibilities?



Apply Here
...for customer contact positions
click here



Build Your Profile
...and let our technology work for you.
click here

Citigroup Inc. and its subsidiaries ("Citigroup") are equal opportunity employers M/F/D/V and do not discriminate on the basis of any legally protected status or characteristic. Nothing in this site constitutes a promise or offer of employment.



careers.citigroup.com

This site is not intended for distribution to, or use by,

EXHIBIT

**1**

Citigroup Privacy Promise
Use of this Site
Terms, conditions, caveats, and small print

Copyright © 1998 - 2002 Citigroup

any person or entity in any jurisdiction or country
where such distribution or use would be contrary to
local law or regulation.





# Employment

- CCS Home
- Retail Credit Services
- Commercial Services
- Employment
  - Message from our President
  - Our Workplace
  - Career Opportunities
  - Benefits

## Our Workplace

**Right people. Right place. Right at home.**

At Citi Commerce Solutions, our goal is to make the work environment as positive, healthy, and supportive as possible. That's why we provide a variety of workplace programs, ranging from business casual dress to professional development opportunities.

*Better People. Better Business.*

Deerfield, Illinois
Gray, Tennessee
Layton, Utah



### Deerfield, Illinois

- Business casual dress
- Smoke-free environment
- Ergonomically designed workstations
- Daycare discounts
- Employee learning center
- Subsidized dining services, including Starbucks
- Public transportation incentives (METRA and Pace Shuttle Service)
- On-site ATM
- Blue jeans every Friday
- Summer Hours


*back to top*

### Gray, Tennessee

- Business casual dress
- Smoke-free environment
- Ergonomically designed workstations
- Daycare discounts
- Employee learning center
- On-site dining services with chef
- On-site ATM and group banking
- Local merchant discounts
- Community involvement
- Quality excellence awards

- Career pathing and employee development programs
- Flexible work schedules

**Layton, Utah**



- Business casual dress
- Smoke-free environment
- Ergonomically designed workstations
- Daycare discounts
- Employee learning center
- Excellent training programs
- Subsidized cafeteria set in a bright, comfortable environment
- One floor, easy access office
- Special on-site services, such as ATM and postage stamps
- Public transportation nearby



# EXHIBIT 1.01(a)

# FORM OF PROVIDER AGREEMENT

This PARTICIPATING PROVIDER AGREEMENT ("Agreement") is entered into by and between CITIBANK USA, N.A. ("Bank"), a banking corporation organized and existing under the laws of the State of South Dakota, with its offices at Sioux Falls, South Dakota. and the signatory to the Citi Health Card Participation Application delivered herewith ("Participant").

## WITNESSETH:

WHEREAS, Bank issues the Citi Health Card to consumers and intends for it to be used to purchase goods and services normally and customarily offered by Participant at Participant's place of business; and

WHEREAS. Participant is in the business of offering goods and services for sale at its place of business and desires to offer consumers the convenience of using the Citi Health Card for payment therefor; and

WHEREAS, Bank directly or through its designee will operate and administer a merchant authorization and settlement program whereby, subject to certain conditions, Bank will authorize certain Citi Health Card transactions for Participant and Participant or its designated agent will present Bank with transaction records for payment.

NOW, THEREFORE, in consideration of the foregoing premises and mutual covenants hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Bank and Participant agree as follows:

## ARTICLE I - DEFINITIONS

1.1   Definitions. Except as otherwise specifically indicated, the following terms will have the meaning specified herein:

"Account" means a Card account. An Account may have more than one Card issued for it. All Accounts are deemed to be the property of Bank. Bank will determine the terms and conditions under which Accounts will be established.

"Application" means Bank's credit application which must be completed by persons who wish to become Cardholders and which must be submitted to Bank for review.

"Authorization" means permission from Bank to make a Card Sale.

"Authorized Goods and Services" means goods and/or services normally and customarily offered by Participant at its place of business.

"Authorization Center" means the facility designated by Bank as the facility at which Card Sales are authorized.

"Business Day" means Mondays through Fridays except days when Bank is closed for business.

"Card" means the Citi Health Card issued by Bank under the Card Plan which evidences an Account.

"Card Plan" means the Citi Health Card program under which Accounts will be established and Cards issued to qualified applicants.

"Card Sale" means any sale of Authorized Goods and Services that Participant makes to a Cardholder pursuant to this Agreement that is charged to an Account.

"Cardholder" means any person to whom a Card has been issued and/or any authorized user of a Card.

"Chargeback" means the refusal of Bank to pay Participant for a Card Sale or the return to Participant and reimbursement to Bank of a Card Sale for which Participant was previously paid.

"Citi Health Card Participation Application" means the application delivered by Participant to Elite Physician Services, LLC in connection with this Agreement.

"Credit" means a non-cash refund issued by Participant to a Cardholder of all or a portion of the amount of a Card Sale.

"Credit Slip" means evidence of a Credit in paper form.

"Net Card Sales" means the total amount of Card Sales properly remitted to Bank minus the total amount of Credits properly remitted to Bank.

"Operating Regulations" means the standard operating procedures of Bank, as they may be changed by Bank from time to time in accordance with Section 2.4 of this Agreement, which are available upon request. For purposes of this Agreement, the Operating Regulations are deemed an integral part of this Agreement and references to this Agreement will be deemed to include the Operating Regulations.

"Required Disclosures" means forms of credit disclosures and disclosure documents provided by Bank which must be used by Participant in connection with advertising, marketing and promoting the Card Plan, accepting Applications and making Card Sales.

"Sales Data" means the electronic data transmission of Card transactions (e.g., Card Sales and Credits).

"Sales Slip" means evidence of a Card Sale in paper form.

"Settlement" means the reimbursement to Participant for the Net Card Sales.

"Settlement Account" means the deposit account(s) at the financial institution(s) designated by Participant as the account(s) to be debited and/or credited, as applicable, for the Settlement of Card transactions and the payment of any fees and charges due hereunder.

1.2.   Construction. Unless the context otherwise clearly indicates, words used in the singular include the plural and words used in the plural include the singular.

## ARTICLE II - ISSUANCE OF ACCOUNTS AND ACCEPTANCE OF CARDS

2.1   Conditions of Opening Accounts. Subject to the terms and conditions of this Agreement, Bank shall receive Applications for Card Accounts and approve or decline Accounts in accordance with Bank's Account issuance criteria. With respect to applications telephoned to Bank (or otherwise electronically transmitted to Bank in a mutually acceptable manner and format) by Participant in conjunction with a sale, Participant shall be responsible for the following:

(i)   Providing all information required on the Application which has been requested by Bank's representative.

(ii)   Obtaining positive identification and verification of the person applying for the Account in accordance with the Operating Regulations, which includes but is not limited to obtaining the person's driver's license number or state issued identification card number and social security number.

(iii)   Obtaining the signature on the Application of all persons whose names will appear on the Account or who will be responsible for the Account.

(iv)   Upon either approval or decline, sending the Application to Bank at the designated address within five (5) Business Days.

(v)   Providing to each applicant a copy of the Citibank Cardholder Agreement (as defined in the Operating Regulations) and any other Required Disclosures Bank provides to Participant for distribution to applicants.

EXHIBIT

2

Failure to adhere to the above procedures may result in a Chargeback in accordance with Section 2.10 of this Agreement.

2.2    Honoring of Cards.

(a)    Conditions for Honoring Cards. Subject to the terms and conditions of this Agreement, Participant agrees to accept the Card for payment of Authorized Goods and Services in those instances when a Cardholder wishes to charge the purchase of Authorized Goods and Services to his/her Account and Participant shall not attempt to suppress or discriminate against use of a Card by a Cardholder (except in accordance with this Agreement). Participant shall not permit Authorized Goods and Services sold to commercial enterprises to be charged to Accounts.

(b)    Commencement of Card Acceptance; Promotion of Card Plan. Acceptance of Cards by Participant will commence on or about the date of this Agreement or as soon thereafter as agreed to by the parties and will continue until the termination of this Agreement. Participant shall actively and consistently promote, participate in and support the Card program and Card Plan throughout the term of this Agreement. Participant shall encourage customers to apply for Cards and shall encourage Cardholders to use Cards for purchases of Authorized Goods and Services.

2.3    Acceptance of Cards. Participant shall accept each Card presented by a Cardholder as payment for Authorized Goods and Services, provided that all of the following conditions are met with respect to each Card Sale and that Participant further complies with all of the procedures set forth elsewhere in this Agreement and in the Operating Regulations relating to the acceptance of Cards each time it makes a Card Sale:

(i)    The Card is presented to Participant on or before the expiration date, if any, shown on its face;

(ii)    The Card is used as payment for Authorized Goods and Services purchased by a Cardholder;

(iii)    Participant will not accept a Card for the purpose of advancing money to a Cardholder or paying money to a Cardholder for any amount that is included in a Card Sale;

(iv)    Participant has followed the procedures for the completion of Sales Slips as set forth in Section 2.5 of this Agreement; and

(v)    Participant has obtained Authorization for the Card Sale.

2.4    Operating Regulations. The Operating Regulations may be changed by Bank from time to time upon not less than sixty (60) days prior written notice to Participant, provided, however, that changes which do not require major systems or operational modifications and changes required for security measures shall become effective as soon as possible following Participant's receipt of notice thereof but in all events shall become effective within five (5) days of Participant's receipt of notice thereof. In the event of any conflict or inconsistency between the terms of this Agreement and those of the Operating Regulations, the former shall govern.

2.5    Completion of Sales Slips. For each Card Sale, Participant shall prepare a Sales Slip using a form that is mutually acceptable to Bank and Participant, e.g., a universal sales slip. Each Sales Slip must be legible and fully completed with the information required hereby. Participant shall include all Authorized Goods and Services purchased in a single transaction on one Sales Slip. Each Sales Slip must be legible and fully completed with the following information:

(i)    The date and location (city/state) of the Card Sale, unless otherwise provided to Bank, e.g., through batch reports, etc.;

(ii)    A brief description of the Authorized Goods and Services;

(iii)    The total amount of the Card Sale, including tax;

(iv)    The Account number;

(v)    The expiration date, if any, of the Card;

(vi)    The Authorization number or code (where applicable); and

(vii)    Participant's merchant number, unless otherwise provided to Bank, e.g., through batch reports.

Each Sales Slip shall be imprinted to obtain a clear imprint of the Card. Participant will not collect tax or any part of the purchase price separately in cash in connection with any Card Sale. A Sales Slip must be signed by the Cardholder for each Card Sale at the time the Card Sale is made and in the presence of an authorized representative or employee of Participant. The signature on the Sales Slip must be reasonably similar to the signature appearing on the signature panel of the Card. After completion of the Card Sale, Participant shall provide a legible and completed copy of the Sales Slip to the Cardholder. If Participant fails to obtain the signature of the Cardholder on a Sales Slip and the Cardholder has not authorized the Card Sale or denies the validity of the Card Sale, the Card Sale shall be subject to Chargeback pursuant to Section 2.10 of this Agreement.

2.6    Authorization.

(a)    General Requirements. In accordance with the terms of this Section 2.6, Participant must obtain Authorization for each proposed Card Sale. For purposes of this Agreement, the purchase of one or more items or other Authorized Goods and Services made by a Cardholder at one Participant location and at one time will be deemed to constitute a single Card Sale.

(b)    Obtaining Authorization. To obtain Authorization, Participant shall contact Bank using a toll-free telephone number provided by Bank for such purpose. If the Authorization Center approves the Card Sale, Participant will be given an Authorization code or number which must be written on the Sales Slip.

(c)    Right of Chargeback. If Authorization for any Card Sale is not obtained by Participant, or requested by Participant but declined by Bank, Bank may

644862.3/NYDOCS02

process a Chargeback for such Card Sale pursuant to Section 2.10 of this Agreement.

2.7    <u>Settlement of Card Transactions.</u>

(a)    <u>Remittance of Sales Data by Participant.</u>    At least weekly, Participant shall remit Sales Data to Bank via the telephone ("Phone Terminal").    Bank shall assign a password to Participant that will be used to access the Phone Terminal.    Participant is responsible for maintaining the confidentiality of such password.    All Sales Data must be remitted to Bank via the Phone Terminal until such time as Bank notifies Participant that a different method is available.    All such remittances must be in Bank's form and format. Remittances of Sales Data must contain all of the information specified in this Agreement and the Operating Regulations.    Upon receipt thereof, Bank will balance and edit the data submitted and make appropriate adjustments for errors or invalid or incomplete transactions.    In the event all or a portion of the required data is not received by Bank or such data is unreadable, Bank shall not be required to process the Sales Data containing the missing or unreadable data, but shall promptly inform Participant or its designated agent of the missing or unreadable data.    Participant shall be responsible for retrieving and resubmitting the Sales Data in completed form.    Participant shall be responsible for the loss, damage or destruction of Sales Data until such Sales Data is received by Bank or by Bank's designated processor.

(b)    <u>Obligation to Reimburse Participant for Sales Data.</u>    Subject to Bank's right of Chargeback, Bank shall reimburse Participant for all Card Sales properly remitted by Participant and received by Bank. Bank will pay Participant an amount equal to the total amount of Card Sales submitted to and received by Bank, less the amount of Credits, if any, submitted by Participant, plus or minus the applicable amount if any, for other adjustments to the amounts so submitted. Bank will not be required to reimburse Participant for any Card Sale not submitted within sixty (60) days of the date of the Card Sale.

(c)    <u>Method and Timing of Settlement.</u>    For each remittance of Sales Data received in Bank's form and format Bank will use its commercially reasonable efforts to initiate the appropriate credit or debit, as applicable, to the Settlement Account through the Automated Clearing House Network ("ACH Network") by the second Business Day after the date of receipt. Participant hereby (i) agrees to be bound by the terms of the operating rules of the National Automated Clearing House Association, as in effect from time to time, and (ii) authorizes Bank and its designated agents and representatives to initiate credit or debit entries and adjustments to the Settlement Account. Bank shall not be liable for any delays in receipt of funds or errors in Settlement Account entries caused by third parties. The following obligations of Participant will survive the termination of this Agreement.    Participant shall not close the Settlement Account without providing Bank at least five (5) Business Days prior written notice of such closure and substitution of another account.    Upon termination of this Agreement, Participant agrees to maintain the Settlement Account with sufficient funds until such time as Bank has processed all Chargebacks and other adjustments and Participant agrees to permit Bank to credit and debit such Settlement Account until all charges, Chargebacks and other adjustments are settled as provided for in this Agreement. Participant shall be solely liable for all fees and costs associated with the Settlement Account.    This authority will remain in effect until five (5) Business Days after Bank receives written notice from Participant of its cancellation of such authorization, provided that in the event of termination of this Agreement, Participant agrees to maintain the Settlement Account with sufficient funds until such time as Participant and Bank agree that all Chargebacks and other adjustments are processed and to permit Bank to credit and debit such Settlement Account until all charges, Chargebacks and other adjustments are settled as provided in this Agreement. Bank shall not be liable to Participant for any delays in receipt of funds or errors in credit entries caused by Participant or by third parties including, but not limited to, a clearinghouse, Participant's financial institution, or any agent of Participant.

(d)    <u>Reserve Account.</u>    Upon notice from Bank to Participant or upon notice of termination of this Agreement by either party, Bank shall retain, for such period of time as Bank deems necessary, but in no event longer than 180 days after termination of this Agreement (the "Reserve Period"), a reserve account ("Reserve Account") to be funded by Participant as hereinafter provided. During the Reserve Period, Bank shall have the right to deduct from the Reserve Account amounts equal to any Chargebacks, Credits and other or adjustments to which Bank is entitled under this Agreement in the event there are insufficient funds in the Settlement Account to cover such Chargebacks, Credits and other adjustments. Alternatively, Bank may offset the amount of any Chargebacks, Credits and other adjustments from future payments to Participant prior to deducting any such amounts from the Settlement Account or Reserve Account. If the Reserve Account is insufficient to cover Chargebacks, Credits and other adjustments or, after the Reserve Account has been returned to Participant, Participant agrees to remit payment for Chargebacks, Credits and other adjustments within three (3) Business Days of a receipt of an invoice from Bank. During the Reserve Period, Participant agrees to continue to process refunds on Card Sales in accordance with Participant's refund policy in effect as of the date of this Agreement, a copy of which policy Participant will provide to Bank upon Bank's request. The Reserve Account will be limited to an amount no greater than the Participant's prior six (6) consecutive months of Chargebacks and Credits (the "Reserve Requirement"). In the event the Agreement has been in effect for less than six months, the Reserve Requirement shall be calculated based on the projected Chargebacks and Credits for such period of time.    Participant shall fully fund the Reserve Account within thirty (30) days after it receives notice from Bank that a Reserve Account will be established or within thirty (30) days after either Bank or Participant provides notice of termination. Alternatively, Bank may, beginning with the date Bank provides Participant with notice that the Reserve Account will be established or the date either party provides notice of termination, and for each Business Day thereafter until the Reserve Requirement has been met, withhold any amounts due that day to Participant for Net Card Sales. If Participant fails to fully fund the Reserve Account within the time periods specified herein, Bank may immediately terminate this Agreement. The Reserve Account shall be maintained by Bank. Bank shall not pay Participant interest on the funds in the Reserve Account. Bank shall return any amounts remaining in the Reserve Account to Participant within two weeks after the end of the Reserve Period.

2.8    <u>Cardholder Credits and Payments.</u>    Unless specifically required by law, Participant shall not give cash refunds to any Cardholder in connection with a Card Sale. For each Credit issued by Participant, Participant shall prepare and deliver to the Cardholder a Credit Slip which Participant shall complete in accordance with the Operating Regulations. Participant shall submit Sales Data evidencing each Credit to Bank within seven (7) days after the Credit is issued in order that the appropriate Credit may be entered on the Cardholder's Account. Participant shall not accept any payment on an Account made by a Cardholder or any other person acting on behalf of a Cardholder.

2.9    <u>Billing Inquiries and Cardholder Disputes.</u>    Bank will notify Participant on a current basis when a Cardholder has made a billing inquiry or filed a billing error notice relating to a Card Sale made by Participant. Participant agrees to investigate and make a good faith effort to resolve each billing inquiry or dispute referred to it by Bank or received directly from a Cardholder.    Within fifteen (15) Business Days from the date Bank sends a billing inquiry or dispute to Participant, Participant shall notify Bank in writing of the resolution thereof or the action Participant will take to resolve the billing inquiry or dispute. Participant shall provide Bank with all such information as Bank may reasonably request in connection therewith.

2.10    <u>Chargeback Rights and Procedures.</u>

(a)    <u>Chargeback Rights.</u>    If Participant has not complied with the terms of this Agreement or with the Operating Regulations with respect to either the opening of Accounts or a Card Sale made by Participant, or if, at the end of the fifteen (15) Business Day billing inquiry/dispute resolution period specified in

Section 2.9 of this Agreement, the billing inquiry or dispute is not resolved (or Bank has not been informed of the resolution or the action Participant will take to resolve the billing inquiry or dispute), Bank may process a Chargeback to Participant for the amount of the Card Sale, the Account balance or the disputed portion thereof, as applicable. If Bank processes a Chargeback and the disputed amount is subsequently paid by the Cardholder, Bank will reimburse Participant for the disputed amount.

(b) <u>Method of Recourse.</u> Bank is not required to pay Participant for a Card Sale which is being charged back. If Bank has already paid Participant for such Card Sale, Bank, at its sole discretion, may deduct the amount to be charged back from the Settlement Account or offset such amount from a future payment to Participant. Alternatively, Bank may demand that Participant pay Bank the amount of the Chargeback and Participant shall make such payment within three (3) Business Days of such demand. Any Chargebacks which are not paid by the aforesaid means shall be due and payable by Participant promptly on demand.

(c) <u>Compliance with Laws.</u> Notwithstanding anything to the contrary contained herein, in the event a Cardholder, in accordance with the provisions of applicable state law or the federal Truth in Lending Act and Regulation Z, as they may be amended from time to time, files with Bank a billing error inquiry or alleges a quality dispute with respect to goods or services purchased from Participant, Bank has the right of Chargeback against Participant with respect to the Card Sale which is the subject of such inquiry or dispute.

2.11 <u>Representations and Warranties.</u> Participant makes the following representations and warranties to Bank with respect to each Account, all Sales Data remitted to Bank, and as to each Card transaction evidenced thereby. Each and all of the representations and warranties made by Participant will survive the termination of this Agreement.

(a) The information set forth on each Application is accurate and correct as provided by the applicant and each Application has been completed in compliance with this Agreement and the Operating Regulations.

(b) The Sales Data represents a bona fide sale made by Participant of Authorized Goods and Services, not previously submitted and is originated by Participant in compliance with this Agreement and the Operating Regulations.

(c) The Card transaction represents obligations of the Cardholder for the amounts in the transaction and only for Authorized Goods and Services actually sold and delivered or actually rendered (including taxes) and does not involve any element of credit for any other purpose.

(d) The Sales Data is free from any alteration not authorized by the Cardholder.

(e) The transaction is in compliance with all applicable law.

(f) The indebtedness represented by the Sales Data has not been pledged as collateral for payment of any indebtedness or obligation of Participant or any other person.

(g) Participant has no knowledge or notice of information that would lead it to believe that the enforceability or collectability of the Sales Data is in any manner impaired.

(h) With respect to any transaction in which a Card is not physically presented to Participant, the Card and Account information contained in the Sales Data is accurate and correct.

2.12 <u>Surcharges.</u> Participant will not impose any surcharge on Authorized Goods and Services. will not require the Cardholder to pay any part of any charge assessed by Bank to Participant, whether through any increase in price or otherwise, or to pay any contemporaneous finance charge in connection with the purchase of Authorized Goods and Services with a Card. Participant will be entitled to grant discounts for cash to Cardholders provided it is clearly disclosed to the Cardholder as a discount and the cash price is presented as a discount from the price charged for all other means of payment.

## ARTICLE III - FEES

3.1 <u>Fees.</u>

(a) For each Card Sale made by Participant, Bank shall charge and Participant agrees to pay a fee in an amount equal to a percentage of the Card Sale determined by the type of promotional plan as set forth below (the "Merchant Fee"):

| Promotional Plan Description | Minimum Purchase | Merchant Fee |
|---|---|---|
| Regular Revolve | none | 4.5% of Net Card Purchases |
| 3 Months No Interest (minimum payment required) | $250 | 4.5% of Net Card Purchases |
| 6 Months No Interest (minimum payment required) | $750 | 6.5% of Net Card Purchases |
| 12 Months No Interest (minimum payment required) | $750 | 8.9% of Net Card Purchases |
| 18 Months No Interest (minimum payment required) | $750 | 13.9% of Net Card Purchases |
| Budget Payment Plan (BPP) 12.96% APR, 48 months | $1250 | 4.5% of Net Card Purchases |

644862.3/NYDOCS02

Bank shall have the right, upon prior notice to Participant, to increase the Merchant Fee.

(b)    For each remittance of Sales Data made to Bank in accordance with Section 2.7(c) of this Agreement, Bank will determine the amount of Net Card Sales made by Participant and then calculate and collect the Merchant Fee based on that amount.

(c)    Beginning ninety (90) days after the effective date of this Agreement, Bank shall charge Participant a minimum processing fee of $10.00 for each month thereafter that Participant's Net Card Sales are less than $300.00 ("Minimum Processing Fee"). Bank shall debit this fee from the Settlement Account in the calendar month following such a qualifying month. Any Minimum Processing Fees paid during a calendar year will be refunded to the Participant provided the total Net Card Sales for said calendar year equals or exceeds six thousand dollars ($6,000). Any refund due for a calendar year will be paid by March 31ᵗʰ of the following year. Upon termination of this Agreement, Bank shall have no obligation to pay any refund earned in the previous year.

(d)    Bank may offset the amount of the Merchant Fee and any other amounts owed by Participant under this Agreement from the Settlement amount due Participant, or Bank may debit the Settlement Account in the amount of the Merchant Fee and any other amounts owed by Participant under this Agreement. If Bank elects the former and the Settlement amount due Participant is insufficient to cover the Merchant Fee and any other amounts owed under this Agreement, Bank, at its option, may offset the amounts owed under this Agreement or any remaining portion thereof from subsequent amounts due Participant or debit the Settlement Account. Any amounts owed which cannot be paid by the aforesaid means shall be due and payable by Participant on demand.

## ARTICLE IV - MISCELLANEOUS

4.1   Indemnification.

(a)    Indemnification by Participant.  Participant shall be liable to and shall indemnify, defend and hold harmless Bank, its affiliates and their respective officers, employees and directors from any losses, damages, claims or complaints (including reasonable outside attorney's fees and disbursements) incurred by Bank, its affiliates and their respective officers, employees and directors arising out of:

(i)    Any claim, complaint or setoff made by or on behalf of a Cardholder with respect to Card Sales or Credits submitted by Participant pursuant to this Agreement;

(ii)    Anything wrongfully done or not done by Participant in connection with the furnishing of any Authorized Goods and Services purchased by Cardholders pursuant to this Agreement;

(iii)    The death or injury to any person or the loss, destruction or damage to any property arising out of the furnishing by Participant of any Authorized Goods and Services purchased with the Card; or

(iv)    Any breach by Participant of an obligation under this Agreement.

(b)    Indemnification by Bank.  Bank shall be liable to and shall indemnify, defend and hold harmless Participant, its affiliates and their respective officers, employees and directors from any losses, damages, claims or complaints (including reasonable outside attorney's fees and disbursements) incurred by Participant, its affiliates and their respective officers, employees and directors arising out of any claim or complaint by a Cardholder with respect to anything wrongfully done or not done by Bank in connection with such Cardholder's Account. Notwithstanding the foregoing, the indemnification by Bank shall not apply to any claim or complaint relating to Participant's failure to resolve a billing inquiry or dispute with a Cardholder.

(c)    Notice of Claim.  If any claim is made or any suit or action is commenced against the indemnified party in respect of which indemnification may be sought under this Section 4.1, the indemnified party shall promptly give the indemnifying party written notice thereof and the indemnifying party will be entitled to assume the defense thereof and to take over and control the settlement thereof (with counsel satisfactory to the indemnified party) at the indemnifying party's cost and expense by giving written notice of its intention to do so to the indemnified party within thirty (30) days after receipt by the indemnifying party of notice of the claim, suit or action. If the indemnifying party assumes the defense of any claim, suit or action, it shall not settle such claim, suit or action unless, the indemnified party consents to such settlement. Notwithstanding the assumption by the indemnifying party of the defense of any claim, suit or action, the indemnified party will be permitted to join in the defense thereof and to employ counsel at its own cost and expense. If the indemnifying party fails to notify the indemnified party of its desire to assume the defense of any claim, suit or action or notifies the indemnified party that it will not assume the defense thereof, then the indemnified party may assume the defense thereof, at the indemnifying party's cost and expense. Any settlement or compromise of, or any final judgment entered on or in, any claim, suit or action which the indemnifying party declines to defend in accordance with this Agreement, will be deemed to have been consented to by, and will be binding upon, the indemnifying party as fully as if the indemnifying party had assumed the defense thereof and a final judgment or decree had been entered in such suit or proceeding, or with regard to such claim, by a court of competent jurisdiction for the amount of such settlement, compromise, judgment or decree. In any case, the indemnifying party and the indemnified party shall cooperate (at no cost to the indemnified party) in the settlement or defense of any such claim, suit or action.

(d)    Payment of Indemnified Amounts.  The indemnified party shall notify the indemnifying party of any amounts due and owing by the indemnifying party under this Section 4.1 and the indemnifying party shall pay such amounts to the indemnified party within thirty (30) after receipt of such notice.

(e)    Survival.  Except for this Section 4.1 and as set forth in Sections 2.7, 2.11 and 4.7, no other terms of this Agreement will survive the termination of this Agreement.

4.2   Card Plan Promotion; Advertising and Service Marks.

(a)    Promotion of the Card Plan.  Participant shall actively and consistently promote, participate in and support the Card program and Card Plan throughout the term of this Agreement. Participant shall prominently display at its place of business advertising and promotional materials relating to the Card Plan, including without limitation, take-one Applications for the Card. Further, to the extent Participant displays other third party credit or charge card materials, it shall display the advertising and promotional materials relating to the Card Plan in a manner and with a frequency equal to or greater than that accorded any

644862.3/NYDOCS02

-5-

other third party credit or charge card. Participant shall only use or display promotional materials relating to the Card Plan in accordance with the Operating Regulations and in accordance with any specifications provided by Bank. Participant shall use and distribute Required Disclosures, as such may change from time to time, in accordance with Bank's requirements.

(b)  Use of Unauthorized Materials.  Notwithstanding anything else to the contrary herein, (1) Participant will be solely responsible for, and will indemnify, defend and hold harmless Bank (subject to Section 4.1) against, any losses, damages, claims, complaints and expenses incurred by Bank as a result of Participant's use of materials not approved by Bank in accordance with the terms of this Section 4.2; and (2) Bank will have the option to terminate this Agreement immediately if Bank reasonably believes that Participant's failure to comply with the terms of this Section 4.2 places Bank at risk.

(c)  Cardholder information.  Cardholders' names and addresses are the property of Bank. Cardholder information may be used by Bank for such purposes as it chooses, including for the promotion of other products and services, whether or not credit-related, such as credit insurance. Participant shall not use Cardholder information for any purpose without the express written consent of Bank.

4.3  Books and Records.  Participant shall retain an original copy of each Sales Slip and Credit Slip for one hundred and eighty (180) days following the date of the Card Sale and a microfilm or other copy thereof for a total of seven (7) years. Participant shall send to Bank the original or a legible copy of any Sales Slip, Credit Slip or any other record relating to this Agreement retained by Participant within fifteen (15) Business Days of a request from Bank.

4.4  Term and Termination.

(a)  Term.  This Agreement shall become effective when signed by Participant and when received and approved by Bank and shall remain in effect until terminated as provided herein. Bank's approval shall be indicated by Bank's provision of services in accordance with this Agreement. The termination of this Agreement will not affect the rights and obligations of the parties with respect to transactions and occurrences which take place prior to the effective date of termination, except as otherwise provided herein.

(b)  Termination.  This Agreement may be terminated:

(i)  by Bank or Participant upon notice to the other party in the event the other party elects to wind up or dissolve its operation or is wound up and dissolved; becomes insolvent or repeatedly fails to pay its debts as they become due; makes an assignment for the benefit of creditors; files a voluntary or involuntary petition in bankruptcy or for reorganization or is adjudicated as bankrupt or insolvent; or has a liquidator or trustee appointed over its affairs and such appointment continues for more than thirty (30) days;

(ii)  by Bank upon notice to Participant in the event (1) Participant fails to comply in any material respect with any representation, warranty, term or obligation under this Agreement; (2) Participant suffers a material adverse change in its business, financial condition, business practices, products or services; (3) Participant sells all or a substantial portion of Participant's business or assets; (4) Bank deems Participant to be financially insecure; or (5) there are, as determined by Bank it its sole discretion, excessive Chargebacks submitted by Participant in any calendar quarter; or

(iii)  by Bank or Participant for any reason upon not less than thirty (30) days' prior notice to the other.

(c)  Duties Upon Termination.  Upon termination of this Agreement, all amounts payable by Participant shall be due and payable in full without demand or notice of any kind and Participant shall promptly submit to Bank all Sales Data for Card transactions made up to the date of termination.

4.5  Status of the Parties.  In performing their responsibilities pursuant to this Agreement, Bank and Participant are in the position of independent contractors. This Agreement is not intended to create, nor does it create and shall not be construed to create, a relationship of partner or joint venture or an association for profit between Bank and Participant. Further, notwithstanding anything to the contrary contained in this Agreement, any third party designated by Participant to perform obligations or functions of Participant under this Agreement, including without limitation, obtaining Authorization or performing data capture, remittance or Settlement functions, will be subject to the approval of Bank and will be deemed to be the agent of Participant for all such purposes and not the agent of Bank and Participant shall be fully liable for the fees and actions of any such third party with respect to the performance of such functions.

4.6  Force Majeure.  Neither party to this Agreement will be liable to the other by reason of any failure in performance of this Agreement in accordance with its terms if such failure arises out of causes beyond the control and without the fault or negligence of such party. Such causes may include, but are not limited to acts of God or of the public enemy, acts of civil or military authority, fires, strikes, unavailability of energy resources, delay in transportation, riots or war. In the event of any force majeure occurrence, the disabled party shall use its best efforts to meet its obligations as set forth in this Agreement. The disabled party shall promptly and in writing advise the other party if it is unable to perform due to a force majeure event, the expected duration of such inability to perform, and of any developments (or changes therein) that appear likely to affect the ability of that party to perform any of its obligations hereunder in whole or in part.

4.7  Confidentiality.

(a)  In performing its obligations under this Agreement, each party may have access to and receive certain confidential or proprietary information about the other party, including, but not limited to: this Agreement, a party's marketing philosophy and objectives, competitive advantages and disadvantages, Cardholder and customer names and addresses, financial results, technological development, sales volume(s), merchandise mix or other information of the business or affairs of each party, its parent company, or its affiliated and subsidiary companies, which that party reasonably considers confidential and/or proprietary (collectively referred to as "Confidential Information"). Each party agrees that it will reveal such Confidential Information only to those of its directors, officers, employees (or, with regard to Bank, directors, officers, employees of Bank, or its affiliates which are involved in the development of the Card program and Card Plan or the directors, officers, and employees of Elite Physician Services, LLC) who are engaged in the implementation of policies, programs or procedures with regard to the acceptance of the Card by Participant. Each party agrees not to use such Confidential Information nor to disclose Confidential Information to any third party, except as may be necessary for that party to perform its obligations pursuant to this Agreement and except as may be agreed upon by the parties. If either should disclose Confidential Information to a third party, such party shall cause said third party to agree to the confidentiality provisions set forth in this Section 4.7.

644862.3/NYDOCS02

(b)    Confidential Information does not include information that was: (i) in the public domain at the time of disclosure; (ii) published or otherwise became a part of the public domain after disclosure to the receiving party through no fault of the receiving party; (iii) already known by the party receiving the information prior to commencing the discussions that led to this Agreement; and (iv) information lawfully obtained from a third party.

(c)    In addition to the provision of Section 4.7 (a) and (b) above, Participant specifically agrees that it will not, without the prior written consent of Bank, disclose to any third party the terms and conditions of this Agreement or the nature of the relationship established by this Agreement, except to the extent such disclosure is required by law or order of a court or governmental agency, **PROVIDED, HOWEVER,** that Participant must give Bank prompt prior notice and permit Bank a reasonable opportunity to obtain a protective order or otherwise protect the confidentiality of the Confidential Information. It is further provided that Participant specifically agrees not to make available (or facilitate the availability of) the terms and conditions of this Agreement in an on-line environment for any purpose whatsoever without first obtaining the written consent of Bank.

(d)    Participant agrees to comply with the "Citigroup Privacy Promise for Consumers", a copy of which is available online at www.healthcard.citicards.com and upon request from Bank, and which is incorporated herein. Bank specifically reserves the right to audit Participant for compliance with said privacy policy.

(e)    Notwithstanding anything to the contrary herein, the terms of this Section 4.7 will survive the termination of this Agreement.

4.8    Financial Information.    Upon request by Bank, Participant shall provide Bank with financial statements and such other financial information reasonably requested by Bank.

4.9    Assignability: Successors and Assigns.    This Agreement may not be assigned by Participant without the express written consent of Bank. Bank may assign any of the rights, interests, and obligations of Bank hereunder to a parent, subsidiary, affiliate or third party. The rights and obligations of the parties hereto will inure to the benefit of and will be binding upon the successors and permitted assigns of each of them.

4.10    Amendment.    This Agreement may be amended from time to time by Bank upon prior written notice to Participant, unless Participant provides written notice to Bank of its objection to any such amendment within twenty (20) days, in which event any such amendment will not be effective.

4.11    Severability.    If any provision, or portion thereof, of this Agreement is held invalid, illegal, void or unenforceable by reason of any rule or law, administrative order, judicial decision or public policy, all other provisions of this Agreement will nevertheless remain in full force and in effect.

4.12    Entire Agreement.    This Agreement, including the Operating Regulations and any schedules, exhibits and documents referenced herein, constitutes the entire agreement between the parties in connection with the Card program and Card Plan and supersedes all prior agreements, negotiations and communications on such subject matter.

4.13    Governing Law.    This Agreement will be governed by and construed in accordance with the laws of the State of South Dakota.

4.14    Applicable Law or Regulation.    It is expressly understood that changes in the performance of either party's obligations under this Agreement necessitated by a change in interpretation of any applicable federal or state statute or regulation will not constitute a breach of this Agreement.

4.15    Waiver of Jury Trial.    Each party hereto hereby waives to the fullest extent permitted by applicable law any right it may have to a trial by jury with respect to any litigation directly or indirectly arising out of, under or in connection with this Agreement or the activities contemplated by this Agreement. Each party hereto (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce that foregoing waiver and (b) acknowledges that it and the other party hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 4.15.

4.16    Waivers.    Neither party will be deemed to have waived any of its rights, powers or remedies under this Agreement unless such waiver is approved in writing by the waiving party.

4.17    Notices.    Whenever notice or demand under this Agreement is given to or made upon either party by the other party, such notice or demand must be given in writing, either (i) by depositing it in the United States mail addressed to such party at its address as set forth below. with postage thereon prepaid, and any notice or demand so mailed will be deemed to have been given at the time when it was mailed, or (ii) by courier, telecopier, or similar method, and such notice or demand will be deemed to have been given when the writing or other form of notice or demand is either personally delivered to the party or delivered to the address set forth below. Notwithstanding the foregoing, notice of intent to terminate this Agreement and notice of default must be sent by certified or registered mail, return receipt requested.

| | |
|---|---|
| If to Bank: | Citibank USA, N.A.<br>701 E. 60th Street North<br>Sioux Falls, South Dakota 57104<br>Attn: Senior Vice President |
| With a copy to: | Citi Commerce Solutions, Inc.<br>Four Parkway North<br>Deerfield, Illinois 60015<br>Attn: Vice President - Controller |
| If to Participant: | At the address designated in its Citi Health Card Participation Application |

EITHER PARTY MAY CHANGE THE ADDRESS TO WHICH NOTICE MUST BE SENT BY GIVING WRITTEN NOTICE OF SUCH CHANGE TO THE OTHER PARTY IN THE MANNER PROVIDED HEREIN.

644862.3/NYDOCS02

4.18 <u>No Third-Party Rights.</u>  Nothing in this Agreement shall create or be deemed to create any third-party beneficiary rights in any person not party to this Agreement.

4.19 <u>Captions.</u>  The captions used in this Agreement have been inserted for convenience and for reference only and will not be deemed to limit or define the text of this Agreement.

BY SIGNING AND DELIVERING THE CITI HEALTH CARD PARTICIPATION APPLICATION TO ELITE PHYSICIAN SERVICES, LLC, PARTICIPANT AGREES TO BE BOUND BY THE TERMS AND CONDITIONS OF THIS AGREEMENT. ANY MODIFICATION OF THE TERMS OF THIS AGREEMENT SHALL REVOKE THIS OFFER FOR SERVICES AND SHALL CONSTITUTE A COUNTEROFFER WHICH SHALL REQUIRE THE SIGNATURE OF BANK TO BECOME ENFORCEABLE.

644862.3/NYDOCS02

# CITI HEALTH CARD

## September-05

EXHIBIT

3

# CITI HEALTH CARD
## September-05

## PORTFOLIO STATISTICS

| | | | | |
|---|---|---|---|---|
| Gross Sales # | 5,895 | 36,831 | 3,088 | 19,267 |
| Gross Sales $ | $ 8,663,742 | $ 54,143,627 | $ 4,569,089 | $ 31,443,563 |
| Returns # | 416 | 2,556 | 223 | 1,621 |
| Returns $ | $ 702,948 | $ 4,184,839 | $ 400,388 | $ 2,906,857 |
| Net Sales # | 5,469 | 34,395 | 2,865 | 17,646 |
| Net Sales $ | $ 5,960,794 | $ 49,958,788 | $ 4,168,700 | $ 28,536,706 |
| Average Ticket | $ 1,090 | $ 1,453 | $ 1,455 | $ 1,617 |

| | (Average) | | (Average) | |
|---|---|---|---|---|
| Total Accounts | 61,268 | 46,608 | 19,187 | 12,665 |
| Active Accounts | 33,547 | 26,929 | 12,881 | 8,595 |
| Activation Rate % | 54.75% | 57.78% | 67.19% | 67.87% |
| Average Account Balance | $ 1,364 | $ 1,406 | $ 1,589 | $ 1,634 |
| Ending Balance | $ 45,769,160 | $ 37,852,147 | $ 20,488,646 | $ 14,046,551 |

## OPERATIONAL STATISTICS

| | | | | |
|---|---|---|---|---|
| Approved Phone | 32 | 389 | 37 | 563 |
| Approved Mail | - | 2 | - | - |
| Approved Fax | 0 | 0 | 0 | 0 |
| Approved Preappv | 0 | - | - | - |
| Approved Remote | 863 | 7,272 | 715 | 4,822 |
| Approved Internet | 396 | 2868 | 170 | 1022 |
| Approved IVR | 2,532 | 21,641 | 1,707 | 11,593 |
| Total Approved | 3,823 | 32,142 | 2,629 | 18,000 |
| Phone Approval % | 53.33% | 51.18% | 49.33% | 57.80% |
| Mail Approval % | 0 | 25.00% | 0 | 0 |
| Fax Approval % | 0 | 0 | 0 | 0 |
| Preappv Approval % | 0 | 0 | 0 | 0 |
| Remote Approval % | 46.30% | 46.29% | 44.69% | 44.43% |
| Internet Approval % | 40.99% | 39.69% | 40.28% | 35.96% |
| IVR Approval % | 54.86% | 55.35% | 51.62% | 52.86% |
| Total Approval % | 50.95% | 51.23% | 48.64% | 49.28% |
| Customer Phone Inquiries | 5,817 | 46,053 | 2,336 | 14,080 |
| Customer Written Inquiries | | | | 47 |
| Store Authorizations | 1,179 | 7,827 | 719 | 4,787 |
| Statement Accounts | 32,478 | 233,838 | 9 | 69,355 |

Case 1:05-cv-06344   Document 37   Filed 12/17/2006   Page 1 of 11

**AmericanAirlines®**



| Chicago (CHI) to Chattanooga Lovell Field (CHA) Wednesday, February 15, 2006 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Carrier | Flight Number | Departing | | Arriving | | Comments | Aircraft |
| | | City | Date & Time | City | Date & Time | | |
| **AA** AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4363 | ORD Chicago | 02/15/2006 02:14 PM | CHA Chattanooga | 02/15/2006 04:47 PM | | ER4 |
| **AA** AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 3996 | ORD Chicago | 02/15/2006 06:26 PM | CHA Chattanooga | 02/15/2006 09:02 PM | | ER4 |
| **AA** AMERICAN AIRLINES | 2333 | ORD Chicago | 02/15/2006 02:30 PM | DFW Dallas/ Fort Worth | 02/15/2006 05:00 PM | | M83 |
| **AA** AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 3689 | DFW Dallas/ Fort Worth | 02/16/2006 11:02 AM | CHA Chattanooga | 02/16/2006 01:57 PM | | ERD |
| **AA** AMERICAN AIRLINES | 2337 | ORD Chicago | 02/15/2006 03:30 PM | DFW Dallas/ Fort Worth | 02/15/2006 06:05 PM | | M83 |
| **AA** AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 3689 | DFW Dallas/ Fort Worth | 02/16/2006 11:02 AM | CHA Chattanooga | 02/16/2006 01:57 PM | | ERD |
| **AA** AMERICAN AIRLINES | 2315 | MDW Chicago | 02/15/2006 07:35 AM | DFW Dallas/ Fort Worth | 02/15/2006 10:06 AM | | M80 |
| **AA** AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 3689 | DFW Dallas/ Fort Worth | 02/15/2006 11:02 AM | CHA Chattanooga | 02/15/2006 01:57 PM | | ERD |
| **AA** AMERICAN AIRLINES | 2305 | ORD Chicago | 02/15/2006 07:30 AM | DFW Dallas/ Fort Worth | 02/15/2006 09:56 AM | | M80 |

EXHIBIT
4

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 3689 | DFW Dallas/ Fort Worth | 02/15/2006 11:02 AM | CHA Chattanooga | 02/15/2006 01:57 PM | | ERD |
| AMERICAN AIRLINES | 2341 | ORD Chicago | 02/15/2006 04:30 PM | DFW Dallas/ Fort Worth | 02/15/2006 07:07 PM | | M80 |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 3689 | DFW Dallas/ Fort Worth | 02/16/2006 11:02 AM | CHA Chattanooga | 02/16/2006 01:57 PM | | ERD |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 3866 | MDW Chicago | 02/15/2006 04:36 PM | DFW Dallas/ Fort Worth | 02/15/2006 07:05 PM | | CR7 |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 3689 | DFW Dallas/ Fort Worth | 02/16/2006 11:02 AM | CHA Chattanooga | 02/16/2006 01:57 PM | | ERD |
| AMERICAN AIRLINES | 2301 | ORD Chicago | 02/15/2006 06:30 AM | DFW Dallas/ Fort Worth | 02/15/2006 08:57 AM | | M80 |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 3689 | DFW Dallas/ Fort Worth | 02/15/2006 11:02 AM | CHA Chattanooga | 02/15/2006 01:57 PM | | ERD |
| AMERICAN AIRLINES | 2345 | ORD Chicago | 02/15/2006 05:30 PM | DFW Dallas/ Fort Worth | 02/15/2006 08:07 PM | | M80 |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 3689 | DFW Dallas/ Fort Worth | 02/16/2006 11:02 AM | CHA Chattanooga | 02/16/2006 01:57 PM | | ERD |
| AMERICAN AIRLINES | 67 | ORD Chicago | 02/15/2006 06:00 PM | DFW Dallas/ Fort Worth | 02/15/2006 08:31 PM | | 777 |
| AMERICAN AIRLINES OPERATED BY | 3689 | DFW Dallas/ Fort Worth | 02/16/2006 11:02 AM | CHA Chattanooga | 02/16/2006 01:57 PM | | ERD |

| AMERICAN EAGLE | | | | | | | |
|---|---|---|---|---|---|---|---|
| AA AMERICAN AIRLINES | 2373 | MDW Chicago | 02/15/2006 06:30 PM | DFW Dallas/ Fort Worth | 02/15/2006 09:03 PM | | M80 |
| AA AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 3689 | DFW Dallas/ Fort Worth | 02/16/2006 11:02 AM | CHA Chattanooga | 02/16/2006 01:57 PM | | ERD |
| AA AMERICAN AIRLINES | 2349 | ORD Chicago | 02/15/2006 06:30 PM | DFW Dallas/ Fort Worth | 02/15/2006 09:06 PM | | M80 |
| AA AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 3689 | DFW Dallas/ Fort Worth | 02/16/2006 11:02 AM | CHA Chattanooga | 02/16/2006 01:57 PM | | ERD |
| AA AMERICAN AIRLINES | 2353 | ORD Chicago | 02/15/2006 07:30 PM | DFW Dallas/ Fort Worth | 02/15/2006 09:55 PM | | M80 |
| AA AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 3689 | DFW Dallas/ Fort Worth | 02/16/2006 11:02 AM | CHA Chattanooga | 02/16/2006 01:57 PM | | ERD |
| AA AMERICAN AIRLINES | 2357 | ORD Chicago | 02/15/2006 08:30 PM | DFW Dallas/ Fort Worth | 02/15/2006 10:51 PM | | M80 |
| AA AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 3689 | DFW Dallas/ Fort Worth | 02/16/2006 11:02 AM | CHA Chattanooga | 02/16/2006 01:57 PM | | ERD |
| AA AMERICAN AIRLINES | 2361 | ORD Chicago | 02/15/2006 09:30 PM | DFW Dallas/ Fort Worth | 02/15/2006 11:47 PM | | M80 |
| AA AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 3689 | DFW Dallas/ Fort Worth | 02/16/2006 11:02 AM | CHA Chattanooga | 02/16/2006 01:57 PM | | ERD |
| AA AMERICAN AIRLINES | 439 | ORD Chicago | 02/15/2006 12:07 PM | ATL Atlanta | 02/15/2006 03:02 PM | | M80 |
| | 4098 | ATL | 02/15/2006 | CHA | 02/15/2006 | | AT7 |

Case 1:07-cv-03097-BSJ-GWG    Document 1-30    Filed 04/18/2007    Page 35 of 59

Reservations Case 1:05-cv-00344 - Document 17 Filed 02/17/2006 Page 4 of 22 Page 4 of 11
Flight Schedules - Flight Schedule Search Results

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| DELTA AIR LINES OPERATED BY ATLANTIC SOUTHEAST | | Atlanta | 07:38 PM | Chattanooga | 08:37 PM | | |
| AMERICAN AIRLINES | 1719 | ORD Chicago | 02/15/2006 12:16 PM | IAH Houston | 02/15/2006 03:00 PM | | M80 |
| CONTINENTAL AIRLINES OPERATED BY EXPRESSJET AIRLINES INC DBA CO EXPRESS | 3133 | IAH Houston | 02/15/2006 06:55 PM | CHA Chattanooga | 02/15/2006 10:00 PM | | ER3 |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4285 | ORD Chicago | 02/15/2006 11:30 AM | CLT Charlotte | 02/15/2006 02:15 PM | | ER4 |
| US AIRWAYS OPERATED BY US AIRWAYS EXPRESS - PIEDMONT AIRLINES | 4269 | CLT Charlotte | 02/15/2006 03:35 PM | CHA Chattanooga | 02/15/2006 05:00 PM | | DH3 |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4285 | ORD Chicago | 02/15/2006 11:30 AM | CLT Charlotte | 02/15/2006 02:15 PM | | ER4 |
| US AIRWAYS OPERATED BY US AIRWAYS EXPRESS - PIEDMONT AIRLINES | 4138 | CLT Charlotte | 02/15/2006 05:25 PM | CHA Chattanooga | 02/15/2006 06:55 PM | | DH8 |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4037 | ORD Chicago | 02/15/2006 12:54 PM | CVG Cincinnati | 02/15/2006 03:08 PM | | ER4 |
| DELTA AIR LINES OPERATED BY ATLANTIC SOUTHEAST | 4194 | CVG Cincinnati | 02/15/2006 04:30 PM | CHA Chattanooga | 02/15/2006 05:38 PM | | CRJ |

Case 1:05-cv-00344    Document 17    Filed 02/17/2006    Page 5 of 22

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4281 | ORD Chicago | 02/15/2006 10:55 AM | CVG Cincinnati | 02/15/2006 01:10 PM | | ER4 |
| DELTA AIR LINES OPERATED BY ATLANTIC SOUTHEAST | 4194 | CVG Cincinnati | 02/15/2006 04:30 PM | CHA Chattanooga | 02/15/2006 05:38 PM | | CRJ |
| AMERICAN AIRLINES | 1448 | ORD Chicago | 02/15/2006 10:13 AM | DCA Washington | 02/15/2006 12:57 PM | | M80 |
| US AIRWAYS OPERATED BY US AIRWAYS EXPRESS - PSA AIRLINES | 2527 | DCA Washington | 02/15/2006 02:15 PM | CHA Chattanooga | 02/15/2006 04:04 PM | | CRJ |
| AMERICAN AIRLINES | 1145 | ORD Chicago | 02/15/2006 09:48 AM | ATL Atlanta | 02/15/2006 12:40 PM | | M80 |
| DELTA AIR LINES OPERATED BY ATLANTIC SOUTHEAST | 4327 | ATL Atlanta | 02/15/2006 03:40 PM | CHA Chattanooga | 02/15/2006 04:27 PM | | CRJ |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4065 | ORD Chicago | 02/15/2006 02:17 PM | ATL Atlanta | 02/15/2006 05:17 PM | | CR7 |
| DELTA AIR LINES OPERATED BY ATLANTIC SOUTHEAST | 4098 | ATL Atlanta | 02/15/2006 07:38 PM | CHA Chattanooga | 02/15/2006 08:37 PM | | AT7 |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4108 | ORD Chicago | 02/15/2006 08:32 AM | DCA Washington | 02/15/2006 11:20 AM | | CR7 |
| US AIRWAYS OPERATED BY US AIRWAYS EXPRESS - PSA | 2527 | DCA Washington | 02/15/2006 02:15 PM | CHA Chattanooga | 02/15/2006 04:04 PM | | CRJ |

Reservations - Flight Schedules - Flight Schedule Search Results                    Page 6 of 11

| AIRLINES | | | | | | | |
|---|---|---|---|---|---|---|---|
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4315 | ORD Chicago | 02/15/2006 08:29 AM | CVG Cincinnati | 02/15/2006 10:41 AM | | ER4 |
| DELTA AIR LINES OPERATED BY ATLANTIC SOUTHEAST | 4194 | CVG Cincinnati | 02/15/2006 04:30 PM | CHA Chattanooga | 02/15/2006 05:38 PM | | CRJ |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4315 | ORD Chicago | 02/15/2006 08:29 AM | CVG Cincinnati | 02/15/2006 10:41 AM | | ER4 |
| DELTA AIR LINES OPERATED BY COMAIR | 5699 | CVG Cincinnati | 02/15/2006 08:45 PM | CHA Chattanooga | 02/15/2006 09:55 PM | | CRJ |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4324 | ORD Chicago | 02/15/2006 03:30 PM | CLT Charlotte | 02/15/2006 06:20 PM | | ER4 |
| US AIRWAYS OPERATED BY US AIRWAYS EXPRESS - PSA AIRLINES | 2507 | CLT Charlotte | 02/15/2006 07:50 PM | CHA Chattanooga | 02/15/2006 08:57 PM | | CRJ |
| AMERICAN AIRLINES | 525 | ORD Chicago | 02/15/2006 08:15 AM | IAH Houston | 02/15/2006 11:03 AM | | M80 |
| CONTINENTAL AIRLINES OPERATED BY EXPRESSJET AIRLINES INC DBA CO EXPRESS | 2019 | IAH Houston | 02/15/2006 03:30 PM | CHA Chattanooga | 02/15/2006 06:35 PM | | ER3 |
| AMERICAN AIRLINES | 525 | ORD Chicago | 02/15/2006 08:15 AM | IAH Houston | 02/15/2006 11:03 AM | | M80 |
| CONTINENTAL AIRLINES | 3133 | IAH Houston | 02/15/2006 06:55 PM | CHA Chattanooga | 02/15/2006 10:00 PM | | ER3 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| OPERATED BY EXPRESSJET AIRLINES INC DBA CO EXPRESS | | | | | | | | |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4462 | ORD Chicago | 02/15/2006 08:07 AM | CLT Charlotte | 02/15/2006 10:58 AM | | | ER4 |
| US AIRWAYS OPERATED BY US AIRWAYS EXPRESS - PIEDMONT AIRLINES | 4323 | CLT Charlotte | 02/15/2006 02:00 PM | CHA Chattanooga | 02/15/2006 03:27 PM | | | DH3 |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 3906 | ORD Chicago | 02/15/2006 04:16 PM | CVG Cincinnati | 02/15/2006 06:33 PM | | | ERD |
| DELTA AIR LINES OPERATED BY COMAIR | 5699 | CVG Cincinnati | 02/15/2006 08:45 PM | CHA Chattanooga | 02/15/2006 09:55 PM | | | CRJ |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4397 | ORD Chicago | 02/15/2006 06:56 AM | ATL Atlanta | 02/15/2006 09:55 AM | | | CR7 |
| DELTA AIR LINES OPERATED BY ATLANTIC SOUTHEAST | 4340 | ATL Atlanta | 02/15/2006 12:37 PM | CHA Chattanooga | 02/15/2006 01:34 PM | | | AT7 |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4081 | ORD Chicago | 02/15/2006 06:50 AM | CVG Cincinnati | 02/15/2006 09:03 AM | | | ER4 |
| DELTA AIR LINES OPERATED BY ATLANTIC SOUTHEAST | 4194 | CVG Cincinnati | 02/15/2006 04:30 PM | CHA Chattanooga | 02/15/2006 05:38 PM | | | CRJ |
| AMERICAN AIRLINES | 430 | ORD Chicago | 02/15/2006 06:47 AM | DCA Washington | 02/15/2006 09:29 AM | | | M83 |

Case 1:07-cv-03097-BSJ-GWG    Document 1-30    Filed 04/18/2007    Page 39 of 59
Case 4:05-cv-00344    Document 17    Filed 02/17/2006    Page 8 of 22
Reservations - Flight Schedules - Flight Schedule Search Results    Page 8 of 11

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **US AIRWAYS OPERATED BY US AIRWAYS EXPRESS - PSA AIRLINES** | 2527 | DCA Washington | 02/15/2006 02:15 PM | CHA Chattanooga | 02/15/2006 04:04 PM | | CRJ |
| **US AIRWAYS OPERATED BY UNITED AIRLINES** | 6379 | ORD Chicago | 02/15/2006 06:40 AM | DFW Dallas/ Fort Worth | 02/15/2006 09:07 AM | | 319 |
| **AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE** | 3689 | DFW Dallas/ Fort Worth | 02/15/2006 11:02 AM | CHA Chattanooga | 02/15/2006 01:57 PM | | ERD |
| **UNITED AIRLINES** | 1203 | ORD Chicago | 02/15/2006 06:40 AM | DFW Dallas/ Fort Worth | 02/15/2006 09:07 AM | | 319 |
| **AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE** | 3689 | DFW Dallas/ Fort Worth | 02/15/2006 11:02 AM | CHA Chattanooga | 02/15/2006 01:57 PM | | ERD |
| **AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE** | 4002 | ORD Chicago | 02/15/2006 06:33 AM | CLT Charlotte | 02/15/2006 09:25 AM | | ERD |
| **US AIRWAYS OPERATED BY US AIRWAYS EXPRESS - PSA AIRLINES** | 2363 | CLT Charlotte | 02/15/2006 11:35 AM | CHA Chattanooga | 02/15/2006 12:44 PM | | CRJ |
| **AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE** | 4446 | ORD Chicago | 02/15/2006 08:13 PM | ATL Atlanta | 02/15/2006 11:14 PM | | CR7 |
| **DELTA AIR LINES OPERATED BY ATLANTIC SOUTHEAST** | 4733 | ATL Atlanta | 02/16/2006 09:24 AM | CHA Chattanooga | 02/16/2006 10:23 AM | | AT7 |
| **AMERICAN AIRLINES OPERATED BY** | 4446 | ORD Chicago | 02/15/2006 08:13 PM | ATL Atlanta | 02/15/2006 11:14 PM | | CR7 |

| AMERICAN EAGLE | | | | | | | |
|---|---|---|---|---|---|---|---|
| DELTA AIR LINES OPERATED BY ATLANTIC SOUTHEAST | 4340 | ATL Atlanta | 02/16/2006 12:37 PM | CHA Chattanooga | 02/16/2006 01:34 PM | | AT7 |
| UNITED AIRLINES | 469 | ORD Chicago | 02/15/2006 08:20 PM | DFW Dallas/ Fort Worth | 02/15/2006 10:48 PM | | 319 |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 3689 | DFW Dallas/ Fort Worth | 02/16/2006 11:02 AM | CHA Chattanooga | 02/16/2006 01:57 PM | | ERD |
| US AIRWAYS OPERATED BY UNITED AIRLINES | 6389 | ORD Chicago | 02/15/2006 08:20 PM | DFW Dallas/ Fort Worth | 02/15/2006 10:48 PM | | 319 |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 3689 | DFW Dallas/ Fort Worth | 02/16/2006 11:02 AM | CHA Chattanooga | 02/16/2006 01:57 PM | | ERD |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4386 | ORD Chicago | 02/15/2006 08:25 PM | CLT Charlotte | 02/15/2006 11:15 PM | | ER4 |
| US AIRWAYS OPERATED BY US AIRWAYS EXPRESS - PSA AIRLINES | 2575 | CLT Charlotte | 02/16/2006 07:45 AM | CHA Chattanooga | 02/16/2006 08:48 AM | | CRJ |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4386 | ORD Chicago | 02/15/2006 08:25 PM | CLT Charlotte | 02/15/2006 11:15 PM | | ER4 |
| US AIRWAYS OPERATED BY US AIRWAYS EXPRESS - PSA AIRLINES | 2363 | CLT Charlotte | 02/16/2006 11:35 AM | CHA Chattanooga | 02/16/2006 12:44 PM | | CRJ |
| AMERICAN | 4311 | ORD Chicago | 02/15/2006 08:44 PM | CVG Cincinnati | 02/15/2006 10:58 PM | | ER4 |

Reservations Flight Schedules Flight Schedule Search Results                    Page 10 of 11

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| AIRLINES OPERATED BY AMERICAN EAGLE | | | | | | | |
| DELTA AIR LINES OPERATED BY ATLANTIC SOUTHEAST | 4188 | CVG Cincinnati | 02/16/2006 08:35 AM | CHA Chattanooga | 02/16/2006 09:42 AM | | CRJ |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4311 | ORD Chicago | 02/15/2006 08:44 PM | CVG Cincinnati | 02/15/2006 10:58 PM | | ER4 |
| DELTA AIR LINES OPERATED BY COMAIR | 5074 | CVG Cincinnati | 02/16/2006 12:50 PM | CHA Chattanooga | 02/16/2006 01:55 PM | | CRJ |
| UNITED AIRLINES | 1105 | ORD Chicago | 02/15/2006 11:55 AM | DFW Dallas/ Fort Worth | 02/15/2006 02:26 PM | | 733 |
| AMERICAN AIRLINES | 1390 | DFW Dallas/ Fort Worth | 02/15/2006 03:38 PM | ATL Atlanta | 02/15/2006 06:40 PM | | M80 |
| DELTA AIR LINES OPERATED BY ATLANTIC SOUTHEAST | 4098 | ATL Atlanta | 02/15/2006 07:38 PM | CHA Chattanooga | 02/15/2006 08:37 PM | | AT7 |
| US AIRWAYS OPERATED BY UNITED AIRLINES | 6383 | ORD Chicago | 02/15/2006 11:55 AM | DFW Dallas/ Fort Worth | 02/15/2006 02:26 PM | | 733 |
| AMERICAN AIRLINES | 1390 | DFW Dallas/ Fort Worth | 02/15/2006 03:38 PM | ATL Atlanta | 02/15/2006 06:40 PM | | M80 |
| DELTA AIR LINES OPERATED BY ATLANTIC SOUTHEAST | 4098 | ATL Atlanta | 02/15/2006 07:38 PM | CHA Chattanooga | 02/15/2006 08:37 PM | | AT7 |
| AMERICAN AIRLINES | 439 | ORD Chicago | 02/15/2006 12:07 PM | ATL Atlanta | 02/15/2006 03:02 PM | | M80 |
| US AIRWAYS OPERATED BY | 5026 | ATL Atlanta | 02/15/2006 05:30 PM | CLT Charlotte | 02/15/2006 06:52 PM | | CR9 |

| MESA DBA AMERICA WEST EXPRESS | | | | | | | |
|---|---|---|---|---|---|---|---|
| US AIRWAYS OPERATED BY US AIRWAYS EXPRESS - PSA AIRLINES | 2507 | CLT Charlotte | 02/15/2006 07:50 PM | CHA Chattanooga | 02/15/2006 08:57 PM | | CRJ |

CLOSE WINDOW

**AmericanAirlines**

CLOSE WINDOW

PRINT PAGE

**Chattanooga Lovell Field (CHA) to New York (NYC)**
**Wednesday, February 15, 2006**

| Carrier | Flight Number | Departing | | Arriving | | Comments | Aircraft |
|---|---|---|---|---|---|---|---|
| | | City | Date & Time | City | Date & Time | | |
| AA AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 3504 | CHA Chattanooga | 02/15/2006 02:29 PM | DFW Dallas/ Fort Worth | 02/15/2006 03:46 PM | | ERD |
| AA AMERICAN AIRLINES | 750 | DFW Dallas/ Fort Worth | 02/15/2006 05:23 PM | LGA New York | 02/15/2006 09:39 PM | | 738 |
| AA AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 3504 | CHA Chattanooga | 02/15/2006 02:29 PM | DFW Dallas/ Fort Worth | 02/15/2006 03:46 PM | | ERD |
| AA AMERICAN AIRLINES | 878 | DFW Dallas/ Fort Worth | 02/15/2006 05:35 PM | EWR Newark | 02/15/2006 09:49 PM | | M80 |
| AA AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 3504 | CHA Chattanooga | 02/15/2006 02:29 PM | DFW Dallas/ Fort Worth | 02/15/2006 03:46 PM | | ERD |
| AA AMERICAN AIRLINES | 1654 | DFW Dallas/ Fort Worth | 02/15/2006 05:35 PM | JFK New York | 02/15/2006 09:55 PM | | 757 |
| AA AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 3504 | CHA Chattanooga | 02/15/2006 02:29 PM | DFW Dallas/ Fort Worth | 02/15/2006 03:46 PM | | ERD |
| AA AMERICAN AIRLINES | 766 | DFW Dallas/ Fort Worth | 02/15/2006 06:43 PM | LGA New York | 02/15/2006 11:01 PM | | M80 |
| AA AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 3504 | CHA Chattanooga | 02/15/2006 02:29 PM | DFW Dallas/ Fort Worth | 02/15/2006 03:46 PM | | ERD |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| AA AMERICAN AIRLINES | 1438 | DFW Dallas/ Fort Worth | 02/15/2006 07:35 PM | EWR Newark | 02/15/2006 11:45 PM | | M80 |
| AA AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4364 | CHA Chattanooga | 02/15/2006 05:17 PM | ORD Chicago | 02/15/2006 06:08 PM | | ER4 |
| AA AMERICAN AIRLINES | 346 | ORD Chicago | 02/15/2006 07:00 PM | LGA New York | 02/15/2006 10:07 PM | | M83 |
| AA AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4364 | CHA Chattanooga | 02/15/2006 05:17 PM | ORD Chicago | 02/15/2006 06:08 PM | | ER4 |
| AA AMERICAN AIRLINES | 1914 | ORD Chicago | 02/15/2006 08:00 PM | EWR Newark | 02/15/2006 11:02 PM | | M80 |
| AA AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4364 | CHA Chattanooga | 02/15/2006 05:17 PM | ORD Chicago | 02/15/2006 06:08 PM | | ER4 |
| AA AMERICAN AIRLINES | 342 | ORD Chicago | 02/15/2006 08:00 PM | LGA New York | 02/15/2006 11:03 PM | | M80 |
| AA AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4364 | CHA Chattanooga | 02/15/2006 05:17 PM | ORD Chicago | 02/15/2006 06:08 PM | | ER4 |
| AA AMERICAN AIRLINES | 336 | ORD Chicago | 02/15/2006 09:30 PM | LGA New York | 02/16/2006 12:27 AM | | M83 |
| AA AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4126 | CHA Chattanooga | 02/15/2006 06:24 AM | ORD Chicago | 02/15/2006 07:07 AM | | ER4 |
| AA AMERICAN AIRLINES | 1292 | ORD Chicago | 02/15/2006 07:40 AM | EWR Newark | 02/15/2006 10:37 AM | | M80 |
| AA AMERICAN | 4126 | CHA Chattanooga | 02/15/2006 06:24 AM | ORD Chicago | 02/15/2006 07:07 AM | | ER4 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| AIRLINES OPERATED BY AMERICAN EAGLE | | | | | | | |
| A͟A AMERICAN AIRLINES | 390 | ORD Chicago | 02/15/2006 08:00 AM | LGA New York | 02/15/2006 11:01 AM | | M80 |
| A͟A AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4126 | CHA Chattanooga | 02/15/2006 06:24 AM | ORD Chicago | 02/15/2006 07:07 AM | | ER4 |
| A͟A AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4682 | ORD Chicago | 02/15/2006 08:10 AM | JFK New York | 02/15/2006 11:24 AM | | ERD |
| A͟A AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4126 | CHA Chattanooga | 02/15/2006 06:24 AM | ORD Chicago | 02/15/2006 07:07 AM | | ER4 |
| A͟A AMERICAN AIRLINES | 386 | ORD Chicago | 02/15/2006 09:00 AM | LGA New York | 02/15/2006 12:06 PM | | M83 |
| A͟A AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4126 | CHA Chattanooga | 02/15/2006 06:24 AM | ORD Chicago | 02/15/2006 07:07 AM | | ER4 |
| A͟A AMERICAN AIRLINES | 382 | ORD Chicago | 02/15/2006 10:00 AM | LGA New York | 02/15/2006 01:00 PM | | M80 |
| A͟A AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4126 | CHA Chattanooga | 02/15/2006 06:24 AM | ORD Chicago | 02/15/2006 07:07 AM | | ER4 |
| A͟A AMERICAN AIRLINES | 378 | ORD Chicago | 02/15/2006 11:00 AM | LGA New York | 02/15/2006 02:03 PM | | M83 |
| A͟A AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4126 | CHA Chattanooga | 02/15/2006 06:24 AM | ORD Chicago | 02/15/2006 07:07 AM | | ER4 |
| | 4108 | ORD | 02/15/2006 | DCA | 02/15/2006 | | CR7 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| AA AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | | Chicago | 08:32 AM | Washington | 11:20 AM | | | |
| AA AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4800 | DCA Washington | 02/15/2006 12:00 PM | LGA New York | 02/15/2006 01:15 PM | | | ER3 |
| AA AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4126 | CHA Chattanooga | 02/15/2006 06:24 AM | ORD Chicago | 02/15/2006 07:07 AM | | | ER4 |
| AA AMERICAN AIRLINES | 549 | ORD Chicago | 02/15/2006 08:20 AM | STL St Louis | 02/15/2006 09:32 AM | | | M80 |
| AA AMERICAN AIRLINES | 840 | STL St Louis | 02/15/2006 10:52 AM | LGA New York | 02/15/2006 02:11 PM | | | M80 |
| AA AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4126 | CHA Chattanooga | 02/15/2006 06:24 AM | ORD Chicago | 02/15/2006 07:07 AM | | | ER4 |
| AA AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4462 | ORD Chicago | 02/15/2006 08:07 AM | CLT Charlotte | 02/15/2006 10:58 AM | | | ER4 |
| AA AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4898 | CLT Charlotte | 02/15/2006 12:27 PM | LGA New York | 02/15/2006 02:19 PM | | | ER3 |
| AA AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4126 | CHA Chattanooga | 02/15/2006 06:24 AM | ORD Chicago | 02/15/2006 07:07 AM | | | ER4 |
| AA AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4033 | ORD Chicago | 02/15/2006 08:40 AM | GRR Grand Rapids | 02/15/2006 10:36 AM | | | ER4 |
| | 4916 | GRR | 02/15/2006 | LGA | 02/15/2006 | | | ER3 |

Reservations - Flight Schedules - Flight Schedule Search Results Case 1:05-cv-00344 Document 17 Filed 02/17/2006 Page 16 of 22 Page 5 of 11

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| A⁄A AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | | Grand Rapids | 12:32 PM | New York | 02:30 PM | | |
| A⁄A AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4126 | CHA Chattanooga | 02/15/2006 06:24 AM | ORD Chicago | 02/15/2006 07:07 AM | | ER4 |
| A⁄A AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4206 | ORD Chicago | 02/15/2006 09:35 AM | DTW Detroit | 02/15/2006 11:50 AM | | ER4 |
| A⁄A AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4868 | DTW Detroit | 02/15/2006 12:58 PM | LGA New York | 02/15/2006 02:42 PM | | ER3 |
| A⁄A AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4126 | CHA Chattanooga | 02/15/2006 06:24 AM | ORD Chicago | 02/15/2006 07:07 AM | | ER4 |
| A⁄A AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4107 | ORD Chicago | 02/15/2006 09:14 AM | CMH Columbus | 02/15/2006 11:28 AM | | CR7 |
| A⁄A AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4881 | CMH Columbus | 02/15/2006 01:24 PM | LGA New York | 02/15/2006 03:05 PM | | ER3 |
| A⁄A AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4126 | CHA Chattanooga | 02/15/2006 06:24 AM | ORD Chicago | 02/15/2006 07:07 AM | | ER4 |
| A⁄A AMERICAN AIRLINES | 1718 | ORD Chicago | 02/15/2006 09:22 AM | BOS Boston | 02/15/2006 12:36 PM | | M80 |
| A⁄A AMERICAN AIRLINES OPERATED BY | 4622 | BOS Boston | 02/15/2006 01:55 PM | JFK New York | 02/15/2006 03:07 PM | | ER3 |

Reservations - Flight Schedules - Flight Schedule Search Results                Page 6 of 11

| AMERICAN EAGLE | | | | | | | |
|---|---|---|---|---|---|---|---|
| DELTA AIR LINES OPERATED BY ATLANTIC SOUTHEAST | 4099 | CHA Chattanooga | 02/15/2006 11:00 AM | ATL Atlanta | 02/15/2006 11:52 AM | | AT7 |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4866 | ATL Atlanta | 02/15/2006 03:30 PM | LGA New York | 02/15/2006 05:50 PM | | ER3 |
| US AIRWAYS OPERATED BY US AIRWAYS EXPRESS - PSA AIRLINES | 2364 | CHA Chattanooga | 02/15/2006 01:15 PM | CLT Charlotte | 02/15/2006 02:16 PM | | CRJ |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4896 | CLT Charlotte | 02/15/2006 04:02 PM | LGA New York | 02/15/2006 06:05 PM | | ER3 |
| US AIRWAYS OPERATED BY US AIRWAYS EXPRESS - PSA AIRLINES | 2364 | CHA Chattanooga | 02/15/2006 01:15 PM | CLT Charlotte | 02/15/2006 02:16 PM | | CRJ |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4900 | CLT Charlotte | 02/15/2006 06:10 PM | LGA New York | 02/15/2006 08:07 PM | | ER3 |
| DELTA AIR LINES OPERATED BY ATLANTIC SOUTHEAST | 4340 | CHA Chattanooga | 02/15/2006 02:09 PM | ATL Atlanta | 02/15/2006 03:03 PM | | AT7 |
| AMERICAN AIRLINES | 2394 | ATL Atlanta | 02/15/2006 06:20 PM | LGA New York | 02/15/2006 08:33 PM | | M80 |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 3504 | CHA Chattanooga | 02/15/2006 02:29 PM | DFW Dallas/ Fort Worth | 02/15/2006 03:46 PM | | ERD |
| | 1140 | DFW | 02/15/2006 | EWR | 02/15/2006 | | 735 |

Reservations - Flight Schedules - Flight Schedule Search Results    Page 7 of 11

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| CONTINENTAL AIRLINES | | Dallas/ Fort Worth | 05:15 PM | Newark | 09:30 PM | | |
| US AIRWAYS OPERATED BY US AIRWAYS EXPRESS - PSA AIRLINES | 2486 | CHA Chattanooga | 02/15/2006 09:15 AM | CLT Charlotte | 02/15/2006 10:16 AM | | CRJ |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4898 | CLT Charlotte | 02/15/2006 12:27 PM | LGA New York | 02/15/2006 02:19 PM | | ER3 |
| US AIRWAYS OPERATED BY US AIRWAYS EXPRESS - PIEDMONT AIRLINES | 4316 | CHA Chattanooga | 02/15/2006 03:52 PM | CLT Charlotte | 02/15/2006 05:12 PM | | DH3 |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4900 | CLT Charlotte | 02/15/2006 06:10 PM | LGA New York | 02/15/2006 08:07 PM | | ER3 |
| US AIRWAYS OPERATED BY US AIRWAYS EXPRESS - PSA AIRLINES | 2356 | CHA Chattanooga | 02/15/2006 07:15 AM | CLT Charlotte | 02/15/2006 08:16 AM | | CRJ |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4894 | CLT Charlotte | 02/15/2006 09:30 AM | LGA New York | 02/15/2006 11:34 AM | | ER3 |
| US AIRWAYS OPERATED BY US AIRWAYS EXPRESS - PSA AIRLINES | 2314 | CHA Chattanooga | 02/15/2006 04:45 PM | DCA Washington | 02/15/2006 06:22 PM | | CRJ |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4748 | DCA Washington | 02/16/2006 06:00 AM | JFK New York | 02/16/2006 07:10 AM | | ER3 |
| | 4706 | CHA | 02/15/2006 | ATL | 02/15/2006 | | AT7 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| DELTA AIR LINES OPERATED BY ATLANTIC SOUTHEAST | | Chattanooga | 07:00 AM | Atlanta | 07:52 AM | | | |
| AMERICAN AIRLINES | 2370 | ATL Atlanta | 02/15/2006 10:49 AM | LGA New York | 02/15/2006 01:02 PM | | | M80 |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4364 | CHA Chattanooga | 02/15/2006 05:17 PM | ORD Chicago | 02/15/2006 06:08 PM | | | ER4 |
| US AIRWAYS OPERATED BY UNITED AIRLINES | 6768 | ORD Chicago | 02/15/2006 07:00 PM | LGA New York | 02/15/2006 10:09 PM | | | 319 |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4364 | CHA Chattanooga | 02/15/2006 05:17 PM | ORD Chicago | 02/15/2006 06:08 PM | | | ER4 |
| UNITED AIRLINES | 694 | ORD Chicago | 02/15/2006 07:00 PM | LGA New York | 02/15/2006 10:09 PM | | | 319 |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4364 | CHA Chattanooga | 02/15/2006 05:17 PM | ORD Chicago | 02/15/2006 06:08 PM | | | ER4 |
| UNITED AIRLINES | 836 | ORD Chicago | 02/15/2006 08:45 PM | LGA New York | 02/15/2006 11:41 PM | | | 752 |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4364 | CHA Chattanooga | 02/15/2006 05:17 PM | ORD Chicago | 02/15/2006 06:08 PM | | | ER4 |
| US AIRWAYS OPERATED BY UNITED AIRLINES | 6770 | ORD Chicago | 02/15/2006 08:45 PM | LGA New York | 02/15/2006 11:41 PM | | | 752 |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4364 | CHA Chattanooga | 02/15/2006 05:17 PM | ORD Chicago | 02/15/2006 06:08 PM | | | ER4 |
| | 6428 | ORD Chicago | 02/15/2006 09:05 PM | EWR Newark | 02/16/2006 12:10 AM | | | 319 |

Case 1:07-cv-03097-BSJ-GWG    Document 1-30    Filed 04/18/2007    Page 51 of 59
Case 1:05-cv-09344-Document 17    Filed 02/17/2006    Page 20 of 22    Page 9 of 11
Reservations - Flight Schedules - Flight Schedule Search Results

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| US AIRWAYS OPERATED BY UNITED AIRLINES | | | | | | | |
| AA AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4364 | CHA Chattanooga | 02/15/2006 05:17 PM | ORD Chicago | 02/15/2006 06:08 PM | | ER4 |
| UNITED AIRLINES | 974 | ORD Chicago | 02/15/2006 09:05 PM | EWR Newark | 02/16/2006 12:10 AM | | 319 |
| AA AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4126 | CHA Chattanooga | 02/15/2006 06:24 AM | ORD Chicago | 02/15/2006 07:07 AM | | ER4 |
| US AIRWAYS OPERATED BY UNITED AIRLINES | 6750 | ORD Chicago | 02/15/2006 08:05 AM | LGA New York | 02/15/2006 11:13 AM | | 735 |
| AA AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4126 | CHA Chattanooga | 02/15/2006 06:24 AM | ORD Chicago | 02/15/2006 07:07 AM | | ER4 |
| UNITED AIRLINES | 672 | ORD Chicago | 02/15/2006 08:05 AM | LGA New York | 02/15/2006 11:13 AM | | 735 |
| AA AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4126 | CHA Chattanooga | 02/15/2006 06:24 AM | ORD Chicago | 02/15/2006 07:07 AM | | ER4 |
| CONTINENTAL AIRLINES | 1176 | ORD Chicago | 02/15/2006 09:00 AM | EWR Newark | 02/15/2006 11:59 AM | | 735 |
| AA AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4126 | CHA Chattanooga | 02/15/2006 06:24 AM | ORD Chicago | 02/15/2006 07:07 AM | | ER4 |
| US AIRWAYS OPERATED BY UNITED AIRLINES | 6752 | ORD Chicago | 02/15/2006 09:00 AM | LGA New York | 02/15/2006 12:06 PM | | 733 |
| AA AMERICAN | 4126 | CHA Chattanooga | 02/15/2006 06:24 AM | ORD Chicago | 02/15/2006 07:07 AM | | ER4 |

Reservations - Flight Schedules - Flight Schedule Search Results

| AIRLINES OPERATED BY AMERICAN EAGLE | | | | | | | |
|---|---|---|---|---|---|---|---|
| UNITED AIRLINES | 674 | ORD Chicago | 02/15/2006 09:00 AM | LGA New York | 02/15/2006 12:06 PM | | 733 |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4126 | CHA Chattanooga | 02/15/2006 06:24 AM | ORD Chicago | 02/15/2006 07:07 AM | | ER4 |
| US AIRWAYS OPERATED BY UNITED AIRLINES | 6414 | ORD Chicago | 02/15/2006 09:30 AM | EWR Newark | 02/15/2006 12:34 PM | | 735 |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4126 | CHA Chattanooga | 02/15/2006 06:24 AM | ORD Chicago | 02/15/2006 07:07 AM | | ER4 |
| UNITED AIRLINES | 638 | ORD Chicago | 02/15/2006 09:30 AM | EWR Newark | 02/15/2006 12:34 PM | | 735 |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4126 | CHA Chattanooga | 02/15/2006 06:24 AM | ORD Chicago | 02/15/2006 07:07 AM | | ER4 |
| US AIRWAYS OPERATED BY UNITED AIRLINES | 6754 | ORD Chicago | 02/15/2006 10:00 AM | LGA New York | 02/15/2006 01:04 PM | | 752 |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4126 | CHA Chattanooga | 02/15/2006 06:24 AM | ORD Chicago | 02/15/2006 07:07 AM | | ER4 |
| UNITED AIRLINES | 676 | ORD Chicago | 02/15/2006 10:00 AM | LGA New York | 02/15/2006 01:04 PM | | 752 |
| AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4126 | CHA Chattanooga | 02/15/2006 06:24 AM | ORD Chicago | 02/15/2006 07:07 AM | | ER4 |
| US AIRWAYS OPERATED BY | 6418 | ORD Chicago | 02/15/2006 10:45 AM | EWR Newark | 02/15/2006 01:50 PM | | 319 |

Case 1:05-cv-00344    Document 17    Filed 02/17/2006    Page 22 of 22
Reservations - Flight Schedules - Flight Schedule Search Results          Page 11 of 11

| UNITED AIRLINES | | | | | | | |
|---|---|---|---|---|---|---|---|
| **AA** AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4126 | CHA Chattanooga | 02/15/2006 06:24 AM | ORD Chicago | 02/15/2006 07:07 AM | | ER4 |
| UNITED AIRLINES | 642 | ORD Chicago | 02/15/2006 10:45 AM | EWR Newark | 02/15/2006 01:50 PM | | 319 |
| **AA** AMERICAN AIRLINES OPERATED BY AMERICAN EAGLE | 4126 | CHA Chattanooga | 02/15/2006 06:24 AM | ORD Chicago | 02/15/2006 07:07 AM | | ER4 |
| US AIRWAYS OPERATED BY UNITED AIRLINES | 6756 | ORD Chicago | 02/15/2006 11:00 AM | LGA New York | 02/15/2006 02:09 PM | | 733 |

CLOSE WINDOW



Member Center: Sign In | Register

MAKE CNN.com yo

> **BREAKING NEWS**    Al Qaeda's Ayman al-Zawahiri, in videotape on Al-Jazeera, says t
against him in Pakistan failed.

SEARCH    ⦿ THE WEB  ○ CNN.com    [ SEARCH ]    Powered by 丫

Home Page
Asia
Europe
U.S.
World
World Business
Technology
Science & Space
Entertainment
World Sport
Travel
Weather
Special Reports
Video
**ON TV**
CNN Pipeline
What's On
Business Traveller
Quest
Talk Asia
The Scene

Services
Languages



Make your first
destination
here.

# TRAVEL

## New York hotel prices hit all-time high

### Hospitality industry strong after post-September 11 slowdown

Monday, January 2, 2006 Posted: 1543 GMT (2343 HKT)

NEW YORK (AP) -- The Days Inn
Brooklyn sits on a charmless
block in a working-class
neighborhood 30 minutes by
subway from the nearest tourist
spot in Manhattan.

Security glass encloses the front desk.
Breakfast is packaged commercial pastry,
served from a rack in a closet-sized lobby.
The clean but drab rooms overlook train
tracks.



Pedestrians approach the Days Inn hotel
in the Sunset Park section of Brooklyn.

Everything about the place says budget
travel, except the price. On New Year's
Eve, rooms were going for $229 per night.

The hefty bill is no fluke. Hotel prices set wallet-busting records in New York City in
2005 after a long, slow recovery from the 2001 terrorist attacks.

The average daily price of a room in the city hit $292 in November, according to the
hospitality industry analysis firm PKF Consulting. Figures for December weren't yet
available, but the city is a lock to break its previous record yearlong average of $237
per night, set in 2000.

Prices were high in every corner of town, from the noisy motels jammed into industrial
neighborhoods near Kennedy Airport to the palaces near Central Park.

If the cost of a room deterred some people from visiting, it didn't show.

An estimated 22 million nights were sold at city hotels in 2005, according to city tourism
officials, surpassing the 21.4 million last year and the 19.9 million in the year before the
terrorist attacks.

Even the $14,000-per-night presidential suite at the Mandarin Oriental, New York was
occupied about 75 percent of the time in 2005.

advertisemen
Your E-M
Travel the
CNNarabi
Sports Up

EXHIBIT
5

"A-list celebrities," explained hotel spokeswoman Tiana Kartadinata. "New York has a lot of premieres."

New York has never been a cheap place to stay, but today's high prices are remarkable, considering where the city has been.

## Nationwide recovery

Tourism dipped significantly after the September 11 attacks. Hotels dropped their prices to an average $198 per night in 2002, and still the city drew millions fewer tourists than it had two years earlier.

Yet the crisis also prompted a national outpouring of love for the damaged city that may have helped fuel a comeback.

"I think people, for the first time, saw New Yorkers unfiltered," said Christyne Nicholas, president of NYC & Company, the city's convention and visitors bureau.



"A lot of the stereotypes went away after September 11 of us being rude and obnoxious and unwelcoming," she said. "For the first time, our police officers and our firefighters were a tourist attraction."

There has also been a nationwide recovery. Hotel prices across the country fell after the terror attacks, but grew 4 percent in 2004 and about 5 percent in 2005, according to Smith Travel Research. The average U.S. hotel room now costs $90.80.

**At the posh Mandarin Oriental, the base rate for a room will rise to $725 in 2006.**

In New York, simple laws of supply and demand may have made a difference too.

In recent years, the city's ultra-hot real estate market has prompted a rash of conversions of old hotels into luxury condominiums -- most notably, the famed 805-room Plaza Hotel near Central Park.

The overall number of hotel rooms in Manhattan has dwindled by about 1,500 in the past two years, officials said.

Some relief may be on the way. About 5,000 new rooms are expected to open in the city in the coming years, mostly at medium-priced chain hotels being constructed slightly off the beaten path.

"I think we need 1,000 to 1,500 extra rooms per year, just to keep up with the expanding economy," said PKF senior vice president John Fox.

For those travelers on a tight budget, now may be the time to visit. Prices will drop significantly in the next few months as winter sets in and holiday visitors clear out.

For those willing to travel in January and February there are some nice rooms to be had at three-star hotels in Manhattan for relatively bargain basement prices: around $160 per night.

But don't expect the discounts to last long.

At the posh Mandarin Oriental, which opened in the new Time Warner building overlooking Central Park two years ago, the base rate for a room will rise to $725 in



2006. On opening night, the same quarters could be had for $595.

For those with smaller wallets, there is always the Days Inn Brooklyn.

*Copyright 2006 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.*

**Story Tools**

🅱🔊 SAVE THIS    🅱✉ E-MAIL THIS

🅱🖨 PRINT THIS    🅱☆ MOST POPULAR

— advertisement —



Click Here to try 4 Free Trial Issues of Time!

## TRAVEL

Section Page



Fighting germs at 35,000 feet

- Freezing, crowded ... but worth it
- Shimmer and shake in Brazil
- Dog days ahead for biz travel

## TOP STORIES

Home Page | Video | Most Popular



EU urges Hamas to disarm

- Climate change 'worse than thought'
- Most trapped Canada miners rescued
- Wounded newsmen in German hospital

---

**CNN U.S.**  |  Languages  |  **CNN TV**    **E-mail Services**    **CNN Mobile**    **CNNAvantGo**    **CNNtext**    **Ad Info**

**SEARCH**  |  ⦿ THE WEB   ◯ CNN.com    [          ]  [ SEARCH ]    Powered by

© 2006 Cable News Network LP, LLLP.
A Time Warner Company. All Rights Reserved.
Terms under which this service is provided to you.
Read our privacy guidelines. Contact us.

External sites open in new window; not endor
Pay service with live and archived vid
Download audio news  |  Add RSS h



May 9, 2005

<u>**VIA HAND DELIVERY**</u>
Michael Dean Salisbury
Dr. Keith B. Dressler
Elite Physician Services, LLC
5726 Marlin Road
The Franklin Building, Suite 101
Chattanooga, TN 37411

      Re:    Master Services Agreement by and among Citicorp Payment Services,
              Inc., Elite Physician Services, LLC, Dr. Keith B. Dressler and Michael
              Dean Salisbury dated as of April 9, 2003.

Dear Mr. Salisbury and Dr. Dressler:

      Please consider this letter notice (the "Notice") of the termination by Citicorp
Payment Services, Inc. ("CPSI") of the Master Services Agreement by and among
Citicorp Payment Services, Inc., Elite Physician Services, LLC, Dr. Keith B. Dressler and
Michael Dean Salisbury dated as of April 9, 2003 (the "Agreement") given pursuant to
Section 7.03(e) of the Agreement. Capitalized terms used in this Notice and not otherwise
defined shall have the meaning ascribed to them in the Agreement. Termination of the
Agreement shall be effective at the close of business on the day that is sixty (60) days
from the date of this Notice.

      It is CPSI's expectation that, unless otherwise directed by CPSI, Elite and the
Principals will continue to service the Program at existing service levels during the period
between the date of this Notice and the effective date of termination (the "Termination
Period"). However, please confer with CPSI before attending any trade shows or other
industry functions on behalf of CPSI, incurring any travel-related expenses, or incurring
any other extraordinary expenses that Elite or the Principals will seek to have paid from
the Annual Budget.

      In addition, in order to ensure a smooth and orderly transition of the Program to
CPSI, we expect that Elite and the Principals will provide transition services during the
Termination Period as requested by CPSI. CPSI's principal representatives for purposes
of transition-related issues will be Patrick Shanders, (847) 597-3125. Please direct all
transition-related communications through him. Should Patrick be unavailable, you



A member of citigroup



Michael Dean Salisbury
Dr. Keith B. Dressler
Elite Physician Services, LLC
May 9, 2005
Page 2

should feel free to contact Dan Deitemeyer (847) 597- 3052, Darin Boddicker (847) 597-3200 or Debbie Sexton (423) 477-6939. In addition, please include all four on email communications relative to transition issues. Dan will be staying in Chattanooga for the next several days and will be taking the lead on transition issues during this time. Please make your primary contact for transition-related matters available to Dan no later than Tuesday morning, May 10 in order to begin to address transition issues.

    We have valued our relationship with Elite, and we wish you all the best in your future endeavors.

Very truly yours,

cc.    Chamblis, Bahner and Stophel, P.C.
       Two Union Square, Suite 1000
       Chattanooga, TN 37402-2500
       Attn. J. Patrick Murphy



**Sheraton**
**Read House**
**HOTEL**
**CHATTANOOGA**

827 Broad Street, Chattanooga, TN 37402
Hotel: 423-266-4121    Fax: 423-643-1224
Reservations: 800-325-3535

### The Sheraton Read House Hotel welcomes Miller & Martin employees and guests to experience our beautiful grace and charm...

More than just a beautiful place to spend a comfortable night, our landmark hotel offers historic accommodations in the heart of Chattanooga and is listed on the National Registry of Historic Places.

The Sheraton Read House Hotel Chattanooga has achieved a brilliant blending of the past and present, affording discerning travelers a chance to relive history while enjoying all the modern amenities of a world-class hotel.

We look forward to hosting your special guests and know that our blend of professionalism and southern hospitality will make their stay in Chattanooga pleasant.

**Our deluxe property includes:**
➢ Sheraton Sweet Sleeper Beds with hypo-allergenic down comforters
➢ Spacious accommodations
➢ Drexel Heritage Furniture
➢ Complimentary internet access in all guestrooms, lobby and Starbucks
➢ Cable TV with free HBO
➢ Indoor pool, jacuzzi and workout room
➢ Located on the free electric shuttle route
➢ Starwood Preferred Guest Programs
➢ Chattanooga's first Chicago style steakhouse, Porter's
➢ Downtown Chattanooga's only Starbucks
➢ Valet parking

For reservations please dial Toll-Free 800-325-3535 and request the Miller & Martin Corporate Discounted Rate. You can also email your reservations request to reservations@readhousehotel.com
- $99.00 - Traditional Room with One King Bed or Two Queens
- $109.00 – Spacious Deluxe King Suite with Separate Sitting Area
- $139.00 – Club Level Suite



EXHIBIT

7